# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | | |
|---|---|---|
| MISSION MEASUREMENT CORPORATION and MISSION METRICS, LCC,[1] | ) ) ) ) | |
| Plaintiffs, | ) ) | Case No. 16 C 6003 |
| v. | ) ) | |
| BLACKBAUD, INC., and MICROEDGE, LLC, | ) ) ) ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

AMY J. ST. EVE, District Court Judge:

On June 8, 2016, Plaintiff Mission Measurement Corporation ("Mission Measurement") brought the present seven-count Complaint against Defendants Blackbaud, Inc. ("Blackbaud") and MicroEdge, LLC ("MicroEdge") alleging violations of the Defend Trade Secrets Act of 2016, 18 U.S.C. § 1831, *et seq.*, as well as supplemental state law claims. *See* 28 U.S.C. §§ 1331, 1367(a). Before the Court is Defendants' motion to dismiss brought pursuant to Federal Rule of Civil Procedure 12(b)(6), or in the alternative, motion for a more definite statement under Rule 12(e). For the following reasons, the Court denies Defendants' motions.

## LEGAL STANDARDS

### I. Motion Under Rule 12(b)(6)

"A motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) challenges the viability of a complaint by arguing that it fails to state a claim upon which relief may be

---

[1] Plaintiffs voluntarily dismiss Mission Metrics as a party to this lawsuit. [21].

granted." *Camasta v. Jos. A. Bank Clothiers, Inc.,* 761 F.3d 732, 736 (7th Cir. 2014). The relevant question at the motion to dismiss stage is not whether the plaintiff will ultimately prevail on the merits, but whether the complaint is sufficient to cross the federal pleading threshold. *See Skinner v. Switzer,* 562 U.S. 521, 529-30, 131 S.Ct. 1289, 179 L.Ed.2d 233 (2011). Under Rule 8(a)(2), a complaint must include "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Under the federal notice pleading standards, a plaintiff's "factual allegations must be enough to raise a right to relief above the speculative level." *Bell Atlantic v. Twombly,* 550 U.S. 544, 555, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007). Put differently, a "complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 1949, 173 L. Ed. 2d 868 (2009) (quoting *Twombly,* 550 U.S. at 570). In determining the sufficiency of a complaint under the plausibility standard, courts must "accept all well-pleaded facts as true and draw reasonable inferences in the plaintiffs' favor." *Roberts v. City of Chicago*, 817 F.3d 561, 564 (7th Cir. 2016). Also, "a plaintiff ordinarily need not anticipate and attempt to plead around affirmative defenses." *Hyson USA, Inc. v. Hyson 2U, Ltd.,* 821 F.3d 935, 939 (7th Cir. 2016).

## II. Motion Under Rule 12(e)

Under Rule 12(e), a party may move for a more definite statement of a pleading that is "so vague or ambiguous that the party cannot reasonably prepare a response." Fed.R.Civ.P. 12(e). The rule "is designed to strike at unintelligibility rather than want of detail." *Gardunio v. Town of Cicero,* 674 F.Supp.2d 976, 992 (N.D. Ill. 2009). "Motions under Rule 12(e) are disfavored generally, and courts should grant such motions only if the complaint is so

2

unintelligible that the defendant cannot draft responsive pleading." *Rivera v. Lake Cnty.,* 974 F. Supp. 2d 1179, 1195 (N.D. Ill. 2013).

## BACKGROUND

In the Complaint, Mission Measurement alleges that it is the market leader in social sector data and insights relating to social change programs aimed at addressing issues such as poverty, hunger, access to healthcare, and climate change. (R. 1, Compl. ¶ 14.) One of Mission Measurement's goals is to change the way non-profits, corporations, governments, and foundations invest in philanthropic causes by using data to measure and forecast social impact program outcomes. (*Id.*) Using data collected from social program evaluations, Mission Measurement has compiled a database of over 75,000 different data points, which it has categorized into approximately 130 social outcome types. (*Id.* ¶ 15.) Mission Measurement alleges that these data are used to grade whether a particular program will achieve its objectives, the average expected cost to do so, and the total number of people the program will serve. (*Id.*)

Over the last eleven years, Mission Measurement has developed its proprietary database – the Outcome Taxonomy™ – that implements Mission Measurement's vision for database and software products and methods to gauge social impact. (*Id.* ¶ 16.) Certain aspects of Mission Measurement's novel system are detailed in the pending U.S. Patent Application Ser. No. 14/137,580 entitled "System and Method for Analyzing and Predicting the Impact of Social Programs," filed on December 20, 2013. (*Id.*)

Defendant MicroEdge is a provider of software solutions to automate the charitable giving process. (*Id.* ¶ 17.) On February 29, 2012, Alan Cline ("Cline"), Principal at Vista Equity Partners ("Vista"), contacted Mission Measurement's CEO Jason Saul ("Saul") to help

MicroEdge develop a way to measure outcomes. (*Id.*) Mission Measurement contends that Vista is a private equity firm that has held significant investments in MicroEdge. (*Id.*) Also, Mission Measurement alleges, upon information and belief, that Vista and MicroEdge knew that MicroEdge had little to no knowledge or experience in measuring outcomes from philanthropic programs and that they needed Mission Measurement's expertise. (*Id.* ¶ 18.) In addition, Mission Measurement maintains that Cline's initial contact led to a series of communications between Mission Measurement and MicroEdge with the goal of jointly developing and owning a new software application based on Mission Measurement's trade secrets, the Outcome Taxonomy, and other intellectual property. (*Id.*)

On March 16, 2012, MicroEdge's CEO Preston McKenzie ("McKenzie") communicated with Saul that MicroEdge desired to engage Mission Measurement to help it develop a software product to measure outcomes. (*Id.* ¶ 20.) According to Plaintiff, Saul made it clear that Mission Measurement had intended to develop a software application for its own commercialization and would not be interested in helping MicroEdge develop a product unless Mission Measurement received equity in MicroEdge or royalties based on sales of the software product. (*Id.*) In April and May 2012, Saul and McKenzie began discussing the terms of this agreement. (*Id.* ¶ 21.) To protect the confidential and proprietary nature of such discussions, Mission Measurement and MicroEdge executed a Confidentiality and Non-Disclosure Agreement dated June 26, 2012. (*Id.* ¶ 22.) Two months later, Mission Measurement sent MicroEdge an email with attachments that described the joint project and included confidential information. (*Id.* ¶ 23.) In the fall of 2012, Mission Measurement and MicroEdge conducted focus groups to determine market demand and to test potential client response to their jointly-developed product. (*Id.* ¶ 24.) During that time,

4

Mission Measurement and MicroEdge negotiated a Joint Development Agreement ("JDA"), which specified that the software was jointly-owned by the parties, that Mission Measurement exclusively owns the Outcomes Taxonomy, and that MicroEdge would pay royalties and a development fee to Mission Measurement upon commercialization. (*Id.*) The parties never executed the JDA. (*Id.*)

According to Plaintiff, throughout the course of their dealing, MicroEdge repeatedly recognized the significant value of Mission Measurement's intellectual property and its importance to the joint software product. (*Id.* ¶ 26.) In 2012 and early 2013, Mission Measurement and MicroEdge began discussing the terms of a definitive agreement to memorialize their understanding that the software product they were developing was and is jointly-owned and that they would share the revenues based on the sales of the product. (*Id.*) As of January 2013, Mission Measurement and MicroEdge had reached an agreement on essential terms, but other terms and conditions had yet to be finalized. (*Id.* ¶ 27.) The parties, however, wanted to finalize the jointly-developed product and launch it as soon as possible, therefore, on January 16, 2013 Mission Measurement and MicroEdge executed a Letter of Intent. (*Id.*) The Letter of Intent explicitly acknowledged the joint nature of the product in terms of joint product development, joint technology development, and joint sales pitch meetings. (*Id.* ¶ 29.) Moreover, the Letter of Intent clearly stated that the Outcomes Taxonomy is Mission Measurement's sole property. (*Id.*)

After execution of the Letter of Intent on January 16, 2013, Mission Measurement continued to share intellectual property with MicroEdge in order to develop a project plan. (*Id.* ¶ 30.) On February 19, 2013, MicroEdge's development team visited Mission Measurement in

5

Chicago where Mission Measurement shared additional confidential information, after which multiple meetings and telephone calls occurred to develop and finalize the product. (*Id.* ¶¶ 30, 31.) Mission Measurement and MicroEdge worked in close collaboration for over two years, from June 2012 through May 2014, to educate MicroEdge's software engineers and executives on Mission Measurement's intellectual property, including its Outcomes Taxonomy, that would be integrated into the jointly-owned software product. (*Id.* ¶ 32.) According to Plaintiff, despite MicroEdge's representations and conduct, MicroEdge failed to act in good faith in negotiating the definitive agreement, but instead embarked on an intentional and consistent strategy of delay and obfuscation in its communications with Mission Measurement. (*Id.* ¶ 37.) Shortly thereafter, in the summer of 2014, MicroEdge ceased communications with Mission Measurement. (*Id.* ¶ 39.)

In early September 2014, Charles Vanek ("Vanek"), MicroEdge's then Vice President of Business Development, forwarded a news report to Saul that stated Defendant Blackbaud bought MicroEdge for $160 million. (*Id.* ¶¶ 27, 40.) In that correspondence, Vanek told Saul that the "radio silence over the last several months was due to this deal." (*Id.* ¶ 40.) During a follow-up telephone conversation with Saul, Vanek stated that the acquisition was a "good thing" for Mission Measurement and that Vanek expected that their joint product would be brought to market even more successfully with Blackbaud's large user base and support. (*Id.*) At no time during the call, or on any of their prior calls, had Vanek terminated the Letter of Intent or Confidentiality Agreement nor did Vanek state that Defendants would not honor their promise to share in the revenue of the joint product. (*Id.* ¶¶ 40, 41.) Nonetheless, on October 26, 2015, Defendants issued a press release that "unveiled its transformational outcomes solution"

6

featuring "a first-of-its-kind outcomes measurement taxonomy," which Plaintiff alleges, upon information and belief, is the joint product covered by the Confidentiality Agreement and Letter of Intent. (*Id*. ¶ 43.) In the fall of 2015 – without Mission Measurement's knowledge or permission – MicroEdge began marketing their jointly-developed software solution. (*Id*. ¶ 44.)

Moreover, Plaintiff alleges that Defendants have blatantly re-characterized the joint product as their own and are acting as if the prior two and one-half years' of work with Mission Measurement never happened. (*Id*. ¶ 45.) On information and belief, Plaintiff asserts that MicroEdge, beginning on or about May 2014, executed a plan to misappropriate Mission Measurement's trade secrets and other intellectual property and to repackage them as its own. (*Id*. ¶ 46.) Unbeknownst to Mission Measurement, Blackbaud was in the process of acquiring MicroEdge, and thus MicroEdge had every motivation to cut Mission Measurement out of the financial rewards attributable to the joint product. (*Id*.) In addition, Plaintiff alleges that Vista's and MicroEdge's plan to pump up MicroEdge's value worked because during the sale process to Blackbaud, the joint software product was valued at tens of millions of dollars. (*Id*. ¶ 47.) Also, during the sale process, either MicroEdge failed to disclose Mission Measurement's rights under the agreements and intellectual property rights, or Blackbaud knew of such rights and Defendants fashioned a strategy to exclude Plaintiff. (*Id*.)

Furthermore, in February 2016, Blackbaud issued a press release concerning Blackbaud Outcomes™, which Plaintiff alleges embodies most – if not all – of the joint product offering developed by Mission Measurement and MicroEdge during 2012 to 2014, including Mission Measurement's Outcome Taxonomy, trade secrets, and other intellectual property. (*Id*. ¶ 48.) Defendants have yet to attribute or pay Mission Measurement for the product it developed with

7

MicroEdge.  (*Id.*)

## ANALYSIS

**I.     Trade Secrets Allegations**

In Count III of the Complaint, Mission Measurement brings a trade secret misappropriation claim under the Defend Trade Secrets Act of 2016 ("DTSA"), which creates a private cause of action in favor of the "owner of a trade secret that is misappropriated ... if the trade secret is related to a product or service used in, or intended for use in, interstate or foreign commerce."  18 U.S.C. § 1836(b)(1).  Under the DTSA, a trade secret includes:

> all forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes, whether tangible or intangible, and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing if –
>
> > (A) the owner thereof has taken reasonable measures to keep such information secret; and
> >
> > (B) the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information[.]

18 U.S.C. § 1839(3).  Under the DTSA, "misappropriation" is defined as "an unconsented disclosure or use of a trade secret by one who (i) used improper means to acquire the secret, or, (ii) at the time of disclosure, knew or had reason to know that the trade secret was acquired through improper means, under circumstances giving rise to a duty to maintain the secrecy of the trade secret, or derived from or through a person who owed such a duty."  *Syntel Sterling Best Shores Mauritius Ltd. v. Trizetto Grp., Inc.*, No. 15CV211, 2016 WL 5338550, at *6 (S.D.N.Y. Sept. 23, 2016) (citing 18 U.S.C. § 1839(5)).

In Count IV, Plaintiff brings a trade secret misappropriation claim under the Illinois Trade Secrets Act ("ITSA"), 765 ILCS 1065. "To prevail on a claim for misappropriation of a trade secret under the Act, the plaintiff must demonstrate that the information at issue was a trade secret, that it was misappropriated and that it was used in the defendant's business." *Learning Curve Toys, Inc. v. PlayWood Toys, Inc.,* 342 F.3d 714, 721 (7th Cir. 2003); *see also Alpha Sch. Bus Co. v. Wagner,* 391 Ill. App. 3d 722, 740, 910 N.E.2d 1134 (1st Dist. 2009). The ITSA defines a "trade secret" as:

> information, including but not limited to, technical or non-technical data, a formula, pattern, compilation, program, device, method, technique, drawing, process, financial data, or list of actual or potential customers or suppliers, that:
>
> (1) is sufficiently secret to derive economic value, actual or potential, from not being generally known to other persons who can obtain economic value from its disclosure or use; and
>
> (2) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy or confidentiality.

*See* 765 ILCS 1065/2(d); *Triumph Packaging Grp. v. Ward,* 834 F. Supp. 2d 796, 806 (N.D. Ill. 2011).

In the present motion, Defendants argue that Plaintiff's trade secret allegations lack sufficient particularity because Plaintiff has failed to specifically identify the exact trade secrets at issue in this lawsuit. Courts in this district, however, have concluded trade secret "allegations to be adequate in instances where the information and the efforts to maintain its confidentiality are described in general terms." *Covenant Aviation Sec., LLC v. Berry,* 15 F. Supp. 3d 813, 818 (N.D. Ill. 2014) (collecting cases). In other words, while "'[i]t is not enough to point to broad areas of technology and assert that something there must have been secret and misappropriated,' *Composite Marine Propellers, Inc. v. Van Der Woude,* 962 F.2d 1263, 1266 (7th Cir. 1992),

9

trade secrets 'need not be disclosed in detail in a complaint alleging misappropriation for the simple reason that such a requirement would result in public disclosure of the purported trade secrets.'"[2] *Covenant Aviation,* 15 F. Supp. 3d at 818 (quoting *AutoMed Techs., Inc. v. Eller,* 160 F.Supp.2d 915, 921 (N.D. Ill. 2001) (quotation omitted). In sum, "[a]t the pleading stage, plaintiffs need only describe the information and efforts to maintain the confidentiality of the information in general terms." *Scan Top Enter. Co., Ltd. v. Winplus N. Am., Inc.,* No. 14 C 7505, 2015 WL 4945240, at *3 (N.D. Ill. Aug. 19, 2015); *see also AutoMed Techs.,* 160 F.Supp.2d at 921 (identifying software and source code met Rule 8(a)(2) requirements). In this context, "[c]ourts only dismiss a claim for lack of specificity on the pleadings in the most extreme cases." *Fire 'Em Up, Inc. v. Technocarb Equip. Ltd.,* 799 F. Supp. 2d 846, 850 (N.D. Ill. 2011) (citation omitted).

Viewing the well-pleaded facts and all reasonable inferences in Plaintiff's favor, Plaintiff has adequately alleged specific information about the confidential information, trade secrets, and intellectual property supporting its trade secret misappropriation claims. More specifically, two months after the parties signed the Confidentiality and Non-Disclosure Agreement, Mission Measurement sent MicroEdge an email with attachments that described the joint project and included confidential information such as a taxonomy sample, screen-shots of an outcomes prototype, and aspects of Plaintiff's system that were not described in the patent allegations. (Compl. ¶ 23.) Mission Measurement also provided MicroEdge with confidential information

---

[2] In *Composite Marine Propellers, Inc. v. Van Der Woude,* 962 F.2d 1263, 1266-68 (7th Cir. 1992) (per curiam), the Seventh Circuit reversed a jury's verdict in which the jury found trade secret misappropriation because the verdict was not supported by the evidence presented at trial.

and product design specifications on July 10, 2012, August 13, 2012, and during September and October 2012. (*Id*.) After the parties executed the Letter of Intent in January 2013, Mission Measurement continued to share its intellectual property. (*Id*. ¶ 30.) In particular, Plaintiff alleges that at the February 2013 meeting in Chicago, the parties discussed product design, gap analysis, technical requirements, and customer lists – raising a reasonable inference that in sharing this information, Mission Measurement revealed confidential information and intellectual property. (*Id*.) Further, Plaintiff sets forth the following confidential and proprietary information that it disclosed to MicroEdge during the relevant time period: (1) a specialized Outcomes Taxonomy; (2) a method for collecting standardized data; (3) a method for calculating grantee impact; (4) software design specifications; (5) impact reports and analytics; and (6) business models for selling access to metrics databases. (*Id*. ¶ 33.) Other confidential information included drawings, sketches, designs, screen mock-ups, measurement concepts and calculations, business plans, and product development plans. (*Id*. ¶ 34.) Mission Measurement also explains that it did not disclose certain aspects of its intellectual property in the patent application – as permitted by patent law – because these aspects were trade secrets. (*Id*.)

MicroEdge used and then disclosed this information to Blackbaud in an effort pump up MicroEdge's value by millions of dollars. (*Id*. ¶ 47.) Both Blackbaud and MicroEdge used Plaintiff's trade secrets in their businesses by marketing and selling Blackbaud Outcomes™, which embodies most, if not all, of the joint product offering. (*Id*. ¶ 48.) Plaintiff's allegations also reflect that it made reasonable efforts to maintain the information's secrecy and confidentiality by entering into the detailed Confidentiality and Non-Disclosure Agreement concerning its trade secrets, Outcome Taxonomy, and other intellectual property. (*Id*. ¶ 23.)

11

Based on these detailed allegations, Plaintiff has sufficiently identifying the trade secrets at issue, including the dates and ways it shared this information with Defendants, especially because the only relationship the parties had was collaborating on the jointly-developed software. Therefore, Plaintiff has plausibly alleged that Defendants misappropriated the relevant trade secrets. *See Iqbal*, 556 U.S. at 678 ("A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."). Defendants' insistence that Plaintiff allege its trade secrets with "particularity" is not supported by case law or the federal pleadings standards. Similarly, Defendants' argument that Plaintiff should have separated the relevant trade secrets from the public information disclosed in Mission Measurement's patent application is not supported by any legal authority or Rule 8(a)(2). The Court therefore denies Defendants' motion to dismiss Counts III and IV.

## II.     Quasi-Contract Claims

Next, Defendants argue that Plaintiff's quasi-contract claims of promissory estoppel and unjust enrichment as alleged in Counts V and VII are barred because the January 2013 Letter of Intent and June 2012 Confidentiality Agreement control the present dispute and that Plaintiff's quasi-contract claims are based on the same subject matter.[3]  Under Federal Rule of Civil Procedure 8(d)(2), however, a "party may set out 2 or more statements of a claim or defense alternatively or hypothetically, either in a single count or defense or in separate ones." Indeed, under the federal procedural rules, a "party may state as many separate claims or defenses as it

---

[3] Plaintiff's argument that its promissory estoppel and unjust enrichment claims are not based on the same factual subject matter as the Letter of Intent and Confidentiality Agreement is best left for summary judgment after the parties have conducted discovery.

has, regardless of consistency." Fed.R.Civ.P. 8(d)(3). As the Supreme Court explains, the "[r]ules recognize that a person may not be sure in advance upon which legal theory she will succeed, and so permit parties" to plead inconsistent claims in the alternative. *Cleveland v. Policy Mgmt. Sys. Corp.,* 526 U.S. 795, 805 (1999); *see also Peterson v. McGladrey & Pullen, LLP,* 676 F.3d 594, 597 (7th Cir. 2012); *Pirelli Armstrong Tire Corp. Retiree Med. Benefits Trust v. Walgreen Co.*, 631 F.3d 436, 448 (7th Cir. 2011); *see, e.g., Santangelo v. Comcast Corp.,* 162 F. Supp. 3d 691 (N.D. Ill. 2016) ("a plaintiff can bring an unjust enrichment claim in the alternative to a breach of contract claim."); *In re Fluidmaster, Inc.,* 149 F. Supp. 3d 940, 963 (N.D. Ill. 2016) ("While Plaintiffs' unjust enrichment claim may eventually give way to Plaintiffs' breach of contract and fraud claims, Plaintiffs may plead in the alternative at this stage in the litigation."). Therefore, under the federal procedural rules, Plaintiff may allege promissory estoppel and unjust enrichment claims in the alternative to its breach of contract claims. The Court therefore denies Defendants' motion to dismiss Counts V and VII.

## III.     Breach of Contract – Count VI

In Count VI, Plaintiff alleges a breach of contract claim based on MicroEdge's post-January 2013 promises that the software product at issue was jointly-owned by both MicroEdge and Mission Measurement. Defendants first argue that the Court must dismiss this claim because the January 16, 2013 Letter of Intent includes a merger clause stating that this "letter constitutes the entire understanding and agreement between the parties hereto and their affiliates with respect to its subject matter and supersedes all *prior or contemporaneous* agreements, representations, warranties and understandings of such parties (whether oral or written)." (R. 16, Ex. A, LOI ¶ 13.) (emphasis added). Here, the merger clause only covers prior or

contemporaneous agreements and not oral promises made after the parties executed the Letter of Intent in January 2013. Therefore, Defendants' argument is unavailing at this procedural posture.

Next, Defendants argue that the Illinois Statute of Frauds precludes enforcement of any such promise that cannot be performed within one calendar year "unless the promise or agreement upon which such action shall be brought, or some memorandum or note thereof, shall be in writing, and signed by the party to be charged therewith, or some other person thereunto by him lawfully authorized." 740 ILCS 80/1. The statute of frauds is an affirmative defense as listed by Rule 8(c)(1) and Plaintiff "need not anticipate and attempt to plead around affirmative defenses." *Hyson USA, Inc.,* 821 F.3d at 939. Also, whether the oral promise can be performed within one calendar year is a question of fact best left for summary judgment. The Court therefore denies Defendants' motion to dismiss Count VI.

## IV.  Rule 12(e) Motion

In the alternative, Defendants argue that Plaintiff must provide a more definite statement under Rule 12(e). Courts, however, disfavor Rule 12(e) motions unless a plaintiff's allegations are so unintelligible, vague, or ambiguous that the defendant cannot draft a responsive pleading. *See Rivera v. Lake Cnty.,* 974 F. Supp. 2d at 1195; *Gardunio v. Town of Cicero,* 674 F.Supp.2d at 992. Here, Plaintiff's allegations are not vague or unintelligible, but are factually detailed and state a plausible claim for relief – as discussed in detail above. *See Iqbal,* 556 U.S. at 679 ("Determining whether a complaint states a plausible claim for relief" is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense."). Also, Defendants have already drafted one responsive pleading and have failed to convince the Court

they are unable to admit, deny, or claim lack knowledge in answering Plaintiff's allegations. *See Rivera,* 974 F.Supp.2d at 1195. As such, the Court denies Defendants' Rule 12(e) motion.

## CONCLUSION

For these reasons, the Court denies Defendants' Rule 12(b)(6) motion to dismiss and also denies Defendants' Rule 12(e) motion for a more definite statement.

**Dated:** October 27, 2016

                                             **ENTERED**

                                             *[signature]*

                                             **AMY J. STUEVE**
                                             **United States District Court Judge**