**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| MISSION MEASUREMENT CORPORATION, | ) ) ) | |
| Plaintiff, | ) ) | Case No. 16 C 6003 |
| v. | ) ) | |
| BLACKBAUD, INC., et al., | ) ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

AMY J. ST. EVE, District Court Judge:

On July 25, 2017, Plaintiff Mission Measurement Corporation ("Mission Measurement") brought the present twelve-count Second Amended Complaint against Defendants Blackbaud, Inc. ("Blackbaud"), MicroEdge, LLC ("MicroEdge"), Vista Equity Partners Management, LLC ("Vista Management"), VFF I AIV I, L.P. ("Vista I Fund"), VFF I AIV I-A, L.P. ("Vista I-A Fund"), Bregal Sagemount I, L.P. ("Sagemount"), and individual Defendants Scott Adkins, Rachel Arnold, Todd Laddusaw, Joel Martins, Preston McKenzie, Benny Melumad, Phil Montgomery, Kristin Nimsger, and Charles Vanek ("Individual Defendants") alleging violations of the Defend Trade Secrets Act of 2016 ("DTSA"), 18 U.S.C. § 1831, *et seq.,* as well as state law claims, including an Illinois Trade Secrets Act ("ITSA") claim, 765 ILCS 1-65/1, *et seq*.

Before the Court are Defendants' motions to dismiss under Federal Rules of Civil Procedure 12(b)(2) and 12(b)(6) in which they challenge all of Mission Measurement's claims except for its DTSA and ITSA claims against Blackbaud and MicroEdge as alleged in Counts III and IV of the Second Amended Complaint. For the following reasons, the Court grants in part with prejudice, grants in part without prejudice, and denies in part Defendants' motions to

dismiss.  Specifically, the Court dismisses, without prejudice, Individual Defendants Todd

Laddusaw, Benny Melumad, Scott Adkins, Joel Martin, and Rachel Arnold, as well as Vista I

Fund and Vista I-A Fund, for lack of personal jurisdiction pursuant to Rule 12(b)(2).  Further,

the Court grants MicroEdge's Rule 12(b)(6) motion to dismiss Plaintiff's breach of the

Confidentiality Agreement as alleged in Count I with prejudice.  The Court grants Defendants'

Rule 12(b)(6) motions to dismiss Plaintiff's fraudulent inducement claim as alleged in Count X

without prejudice and Plaintiff's Illinois civil conspiracy claim alleged in Count XII without

prejudice.  The Court also grants Plaintiff leave to file a Third Amended Complaint as to its

fraudulent inducement and civil conspiracy claims, keeping in mind counsel's Rule 11

obligations.  Plaintiff's Third Amended Complaint is due on or before January 8, 2018.

The following claims remain in this lawsuit:  (1) breach of MicroEdge's and Plaintiff's

Letter of Intent (Count II); (2) breach of MicroEdge's and Plaintiff's oral contract (Count VI);

(3) the DTSA claim against Blackbaud and MicroEdge (Count III); (4) the ITSA claim against

Blackbaud and MicroEdge (Count IV); (5) the promissory estoppel claim against MicroEdge

(Count V); (6) the unjust enrichment claim against all remaining Defendants (Count VII); (7) the

Illinois tortious interference with contract claim and tortious interference with prospective

economic advantage claim against Blackbaud, Vista Management, Sagemount, and the

remaining Individual Defendants (Counts VIII and IX); and (8) the conversion claim against

Blackbaud and MicroEdge (Count XI).

## LEGAL STANDARDS

### I.      Federal Rule of Civil Procedure 12(b)(2)

A motion to dismiss under Rule 12(b)(2) tests whether a federal court has personal

jurisdiction over a defendant.  *See* Fed. R. Civ. P. 12(b)(2); *Wells Fargo Bank, N.A. v. Younan*

*Prop., Inc.,* 737 F.3d 465, 467 (7th Cir. 2013).  Although the "plaintiff bears the burden of

establishing personal jurisdiction," *Brook v. McCormley,* 873 F.3d 549, 552 (7th Cir. 2017),

when ruling on a Rule 12(b)(2) motion to dismiss based on the submission of written materials, a

plaintiff need only make a prima facie case of personal jurisdiction.  *Northern Grain Mktg., LLC

v. Greving,* 743 F.3d 487, 491 (7th Cir. 2014).  In analyzing a Rule 12(b)(2) motion without

conducting an evidentiary hearing, courts accept the well-pleaded facts in the complaint as true.

*Felland v. Clifton,* 682 F.3d 665, 672 (7th Cir. 2012).

## II.     Federal Rule of Civil Procedure 12(b)(6)

"A motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) challenges the

viability of a complaint by arguing that it fails to state a claim upon which relief may be

granted." *Camasta v. Jos. A. Bank Clothiers, Inc.,* 761 F.3d 732, 736 (7th Cir. 2014); *see also

Hill v. Serv. Emp. Int'l Union,* 850 F.3d 861, 863 (7th Cir. 2017).  Under Rule 8(a)(2), a

complaint must include "a short and plain statement of the claim showing that the pleader is

entitled to relief."  Fed. R. Civ. P. 8(a)(2).  Pursuant to the federal pleading standards, a

plaintiff's "factual allegations must be enough to raise a right to relief above the speculative

level."  *Bell Atlantic v. Twombly,* 550 U.S. 544, 555, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007).

Put differently, a "complaint must contain sufficient factual matter, accepted as true, to 'state a

claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct.

1937, 1949, 173 L. Ed. 2d 868 (2009) (quoting *Twombly,* 550 U.S. at 570).

When determining the sufficiency of a complaint under the plausibility standard, courts

must "accept all well-pleaded facts as true and draw reasonable inferences in the plaintiffs'

favor."  *Roberts v. City of Chicago*, 817 F.3d 561, 564 (7th Cir. 2016).  Also, although a

plaintiff's ability to state allegations based on "information and belief" is restricted in the context

of fraud allegations pursuant to Rule 9(b), under Rule 8(a), "[w]here pleadings concern matters peculiarly within the knowledge of the defendants, conclusory pleading on 'information and belief' should be liberally viewed." *Brown v. Budz*, 398 F.3d 904, 914 (7th Cir. 2005) (citation omitted); *see also* 5 Wright & Miller, Federal Practice & Procedure § 1224, at 300 & n. 7 (3d ed. 2004) ("Pleading on information and belief is a desirable and essential expedient when matters that are necessary to complete the statement of a claim are not within the knowledge of the plaintiff."); *see, e.g., Huon v. Denton,* 841 F.3d 733, 743 (7th Cir. 2016).

## III.    Federal Rule of Civil Procedure 9(b)

With respect to claims of fraud, Rule 9(b) applies and imposes a higher pleading standard than that required under Rule 8(a).  *See Camasta,* 761 F.3d at 736; *Pirelli Armstrong Tire Corp. Retiree Med. Benefits Trust v. Walgreen Co.,* 631 F.3d 436, 446-47 (7th Cir. 2011).  Specifically, "plaintiffs must plead the 'who, what, when, where, and how: the first paragraph of any newspaper story' of the alleged fraud."  *Rocha v. Rudd,* 826 F.3d 905, 911 (7th Cir. 2016) (quotation omitted).  In other words, "[t]he requirement of pleading fraud with particularity includes pleading facts that make the allegation of fraud plausible"; therefore, "[t]he complaint must state 'the identity of the person making the misrepresentation, the time, place, and content of the misrepresentation, and the method by which the misrepresentation was communicated to the plaintiff.'"  *United States ex rel. Grenadyor v. Ukrainian Vill. Pharmacy, Inc.,* 772 F.3d 1102, 1106 (7th Cir. 2014) (citation omitted); *see also United States ex. rel. Hanna v. City of Chicago,* 834 F.3d 775, 779 (7th Cir. 2016).  Allegations based on information and belief will not suffice under Rule 9(b) unless "(1) the facts constituting the fraud are not accessible to the plaintiff and (2) the plaintiff provides 'the grounds for his suspicions.'"  *Id.*, 772 F.3d at 1108 (quotation omitted).

**BACKGROUND**

In its Second Amended Complaint, Mission Measurement alleges that it is the market leader in social sector data and insights relating to social change programs aimed at addressing issues such as poverty, hunger, access to healthcare, and climate change. (R. 75, Second Am. Compl. ¶ 30.) One of Mission Measurement's goals is to change the way non-profits, corporations, governments, and foundations invest in philanthropic causes by using data to measure and forecast social impact program outcomes. (*Id.*) Using data collected from social program evaluations, Mission Measurement has compiled a database of over 75,000 different data points, which it has categorized into approximately 130 social outcome types. (*Id.* ¶ 31.) Mission Measurement maintains that these data are used to grade whether a particular program will achieve its objectives, the average expected cost to do so, and the total number of people the program will serve. (*Id.*)

Over the last eleven years, Mission Measurement has developed its proprietary database – the Outcome Taxonomy$^{TM}$ – that implements its vision for database and software products and methods to gauge social impact. (*Id.* ¶ 32.) Certain aspects of Mission Measurement's system are detailed in the pending U.S. Patent Application Ser. No. 14/137,580 entitled "System and Method for Analyzing and Predicting the Impact of Social Programs," filed on December 20, 2013. (*Id.*) The application, which published on September 18, 2014 as U.S. Pub. No. 2014/0278756, claims priority to an earlier provisional application No. 61/793,908 filed on March 15, 2013. (*Id.*) The application is pending at the U.S. Patent and Trademark Office. (*Id.*)

Defendant MicroEdge, a limited liability company organized under the laws of New York, is a provider of software solutions that automate the charitable giving process. (*Id.* ¶¶ 4, 33.) Vista Management is a limited liability company and investment firm that operates the

private equity funds Vista I Fund and Vista I-A Fund. (*Id.* ¶¶ 5, 33.) Vista Management acquired MicroEdge in 2009 and Vista Management, Sagemount, and the Individual Defendants held investments in MicroEdge during the relevant time period. (*Id.* ¶ 33.) Likewise, Plaintiff alleges that Sagemount operates private equity funds and became a minority investor in MicroEdge during 2013. (*Id.* ¶¶ 6, 33.) The Individual Defendants hold equity interests in MicroEdge or held such interests during the relevant time period. (*Id.* ¶¶ 7-15, 33.)

On February 29, 2012, Alan Cline ("Cline"), Principal at Vista Management, contacted Mission Measurement's CEO Jason Saul ("Saul") to assist MicroEdge in developing a way to measure outcomes. (*Id.* ¶ 34.) According to Plaintiff, Vista Management was actively involved in management decisions at MicroEdge and facilitated a relationship between Vista Management's portfolio company, MicroEdge, and Mission Measurement. (*Id.*) Vista Management remained involved in the relationship between MicroEdge and Mission Measurement until MicroEdge secured a contract with Mission Measurement. (*Id.*) Thereafter, Vista Management participated in various negotiations and conversations between MicroEdge and Mission Measurement. (*Id.*)

Furthermore, Mission Measurement alleges, upon information and belief, that Vista Management and MicroEdge knew that MicroEdge had little or no knowledge or experience in measuring outcomes from philanthropic programs and that they needed Mission Measurement's expertise. (*Id.* ¶ 35.) Mission Measurement contends that Cline's initial contact led to a series of communications between Mission Measurement and MicroEdge with the goal of jointly developing and owning a new software application based on Mission Measurement's trade secrets, the Outcome Taxonomy[TM], and other intellectual property. (*Id.*) MicroEdge engaged in conversations with Mission Measurement through certain Individual Defendants employed by

MicroEdge, such as Preston McKenzie ("McKenzie") and Charles Vanek ("Vanek"). (*Id*.)

Mission Measurement alleges, on information and belief, that Vista Management had significant concerns about obtaining a return on its investment in MicroEdge and wanted MicroEdge to innovate. (*Id*. ¶ 36.) Unable to effectively do so on its own, MicroEdge, through Vista Management, sought out Mission Measurement because MicroEdge would soon be put up for sale and Vista Management and MicroEdge needed new products to increase the enterprise value for the sale. (*Id*.)

With Vista Management's approval, on March 16, 2012, MicroEdge's CEO McKenzie communicated with Mission Measurement's CEO Saul that MicroEdge desired to engage Mission Measurement to help it develop a software product to measure outcomes. (*Id*. ¶ 37.) Plaintiff alleges that Saul made it clear that Mission Measurement had intended to develop a software application for its own commercialization and would not be interested in helping MicroEdge develop a product unless Mission Measurement received equity in MicroEdge or royalties based on sales of the software product. (*Id*.) Plaintiff states Vista Management's Cline and MicroEdge's Vanek and McKenzie knew that a relationship with Mission Measurement would increase MicroEdge's value in the long-term. (*Id*.) Moreover, an increased value in MicroEdge would provide investors with a financial benefit. (*Id*.) According to Mission Measurement, Vista Management and the Individual Defendants were financially motivated to develop and maintain a relationship between MicroEdge and Mission Measurement. (*Id*.)

In April and May 2012, Saul and McKenzie began discussing the terms of the parties' agreement. (*Id*. ¶ 38.) To protect the confidential and proprietary nature of such discussions, Mission Measurement and MicroEdge executed a Mutual Nondisclosure Agreement ("NDA") on May 14, 2012, which defined "confidential information" as all information disclosed or provided

to "Recipient or Recipient's affiliates, directors, officers, employees, agents, or representatives," including, but not limited to various confidential and proprietary information such as business information, technical information, and know-how. (*Id.* ¶ 39.) The NDA limited access to "Confidential Information" to those personnel engaging in a permissible use, namely, for the purpose of collaborating on products and services. (*Id.*) Plaintiff alleges that at no time did MicroEdge seek consent from Mission Measurement to disclose its proprietary information with any non-parties, such as Defendant Blackbaud, or to use its proprietary information for any non-specified uses. (*Id.*)

In May 2012, Individual Defendants, including former MicroEdge employee Benny Melumad, traveled to Chicago, Illinois to meet with Mission Measurement to discuss the partnership. (*Id.* ¶ 40.) Plaintiff asserts that at various points throughout contract negotiations the Individual Defendants intended to induce Mission Measurement to engage in various contractual agreements with MicroEdge to eliminate competition for an outcomes product – despite knowing that MicroEdge would not share any ownership or royalties of this product with Mission Measurement because that would drive down the sale price of MicroEdge and the Individual Defendants' resulting profits. (*Id.*) Notwithstanding these intentions, the Individual Defendants repeatedly assured Mission Measurement that the parties were moving forward together to develop a joint software product. (*Id.*)

Shortly thereafter, Mission Measurement and MicroEdge executed a Confidentiality and Non-Disclosure Agreement dated June 26, 2012. (*Id.* ¶ 41.) According to Mission Measurement, this agreement included, among other terms, provisions that prohibited the use and disclosure of confidential information to any third-party. (*Id.*) Two months later, Mission Measurement sent MicroEdge an email with attachments that described the joint project and

included confidential information, such as a taxonomy sample and screenshots of an outcomes prototype, as well as aspects of its system that are not described in the patent applications. (*Id*. ¶ 42.) Mission Measurement also provided MicroEdge with confidential information and product design specifications on other occasions during 2012. (*Id*.)

In the fall of 2012, Mission Measurement and MicroEdge conducted focus groups to determine market demand and to test potential client responses to their jointly-developed product. (*Id*. ¶ 43.) During that time, Mission Measurement and MicroEdge negotiated a Joint Development Agreement ("JDA"), which specified that the software was jointly-owned by the parties, that Mission Measurement exclusively owns the Outcomes Taxonomy™, and that MicroEdge would pay royalties and a development fee to Mission Measurement upon commercialization. (*Id*.) The parties never executed the JDA. (*Id*.) Meanwhile, around October 16, 2012, Mission Measurement and MicroEdge jointly presented their product prototype before a focus group of their clients and potential clients, who were bound by confidentiality. (*Id.* ¶ 44.) At that time, the Outcomes Taxonomy™ was specifically identified as Mission Measurement's intellectual property. (*Id*.) Indeed, before and during the focus group presentations, MicroEdge explicitly acknowledged that the Outcomes Taxonomy™ and other intellectual property originated solely from Mission Measurement. (*Id.*)

According to Plaintiff, throughout the course of their dealings, MicroEdge repeatedly recognized the significant value of Mission Measurement's intellectual property and its importance to the joint software product. (*Id*. ¶ 45.) In 2012 and early 2013, Mission Measurement and MicroEdge began discussing the terms of a definitive agreement to memorialize their understanding that the software product they were developing was and is jointly-owned and that they would share the revenues based on the sales of the product. (*Id*.) As

of January 2013, Mission Measurement and MicroEdge had reached an agreement on the essential terms, but had yet to finalize other terms and conditions. (*Id*. ¶ 46.) The parties wanted to finalize the product and launch it as soon as possible, and to that end, on January 16, 2013, Mission Measurement and MicroEdge executed a Letter of Intent ("LOI") as an interim agreement prior to the execution of a definitive agreement. (*Id*.)

Mission Measurement and MicroEdge agreed that the terms and conditions of the LOI were confidential. (*Id.* ¶ 47.) Among other provisions, the LOI requires that Mission Measurement and MicroEdge: (1) collaborate on joint software product development combining Mission Measurement's trade secrets and intellectual property and MicroEdge's existing software; (2) keep confidential the proprietary information provided to the other; and (3) negotiate in good faith to finalize the definitive agreement. (*Id*.) Mission Measurement alleges that the LOI explicitly acknowledged the joint nature of the product in terms of joint product development, joint technology development, and joint sales pitch meetings, although the Outcomes Taxonomy™ is stated as Mission Measurement's sole property. (*Id*. ¶ 48.)

Further, Mission Measurement asserts that the parties continued performing the LOI and continued advancing development efforts while negotiating the final details of the written agreement. (*Id*. ¶ 49.) Despite being unable to complete a written agreement covering the joint product, the parties entered into an oral agreement for continued joint development efforts with the understanding they would be sharing royalties and ownership. (*Id*.) According to Plaintiff, by their course of performance and oral affirmations, the parties mutually agreed to be bound by the LOI and to be bound by an oral agreement which supplemented the terms of the LOI. (*Id.* ¶ 50.) Plaintiff alleges that the parties' oral agreement included the following terms: (1) continued good faith efforts to jointly develop a software product which embodied Mission Measurement's

Outcomes Taxonomy<sup>TM</sup>; (2) the software product would be jointly owned by the parties; (3) Mission Measurement would retain ownership of the Outcomes Taxonomy<sup>TM</sup>; and (4) the parties would share royalties related to the sale of the software product. (*Id*.) The parties further agreed that neither party would misuse any confidential information learned from the other party. (*Id*.)

Additionally, Mission Measurement alleges that it relied, to its detriment, on MicroEdge's promises to continue development efforts in good faith and to share royalties on the sales of the joint product. (*Id*. ¶ 51.) Mission Measurement specifically maintains that it refrained from engaging in any development efforts with any other partner besides MicroEdge, and, as a result, Mission Measurement was kept out of the market. (*Id*.) Furthermore, Mission Measurement asserts that MicroEdge and the Individual Defendants knew that they were effectively sidelining Mission Measurement, namely, they knew that Mission Measurement was persistent about developing a product together and that it continued to seek assurances that the parties were collaborating. (*Id*.) Nevertheless, MicroEdge and the Individual Defendants – with support and guidance from Vista Management and Sagemount – continued to make misrepresentations to Mission Measurement. (*Id*.)

After the execution of the LOI on January 16, 2013, Mission Measurement continued to share its intellectual property with MicroEdge to develop a project plan. (*Id*. ¶ 54.) On February 19, 2013, MicroEdge's development team visited Mission Measurement in Chicago where Mission Measurement shared additional confidential information, after which multiple meetings and telephone calls occurred to develop and finalize the jointly-owned software product. (*Id.* ¶¶ 54, 55.) On information and belief, Plaintiff alleges that MicroEdge held its quarterly board meeting in Chicago in December 2013 that Individual Defendants Kristin Nimsger, Todd Laddusaw, Scott Adkins, Benny Melumad, Phil Montgomery, and Charles Vanek attended. (*Id*.

¶ 56.) The board meeting was intended to relay information about MicroEdge's product development efforts. (*Id*.) Mission Measurement alleges that thereafter, the Individual Defendants continued to induce Mission Measurement to engage in development efforts and to continue sharing proprietary information, and in reliance on these representations, Mission Measurement failed to enter the marketplace with its own product and failed to enter into other prospective business relationships to develop a product. (*Id*.) According to Mission Measurement, the Individual Defendants knew that it intended to share any ownership of the product and royalties with MicroEdge. (*Id*.)

Meanwhile, Mission Measurement and MicroEdge worked in close collaboration for over two years, from June 2012 through May 2014, to educate MicroEdge's software engineers and executives on Mission Measurement's intellectual property that would be integrated into the jointly-owned software product. (*Id*. ¶ 57.) During this collaboration period, Vista Management was involved in developing the relationship between Mission Measurement and MicroEdge to advance a longer-term initiative at MicroEdge to improve outcomes measurement. (*Id*.) Among other confidential and proprietary information shared with MicroEdge from 2012 to 2014, Mission Measurement disclosed: (1) a specialized Outcomes Taxonomy[TM]; (2) a method for collecting standardized data; (3) a method for calculating grantee impact; (4) software design specifications; (5) impact reports and analytics; and (6) business models for selling access to metrics databases. (*Id*. ¶ 58.) Mission Measurement disclosed other confidential information to MicroEdge from 2012 to 2014 that included drawings, sketches, designs, screen mock-ups, measurement concepts and calculations, business plans, and product development plans. (*Id*. ¶ 59.) On the other hand, Mission Measurement did not disclose certain aspects of its intellectual property in the patent application filings, but kept them as trade secrets. (*Id*.) During the

relevant time period, Mission Measurement maintained in secret the proprietary and confidential information disclosed to MicroEdge and continues to derive significant value from the secrecy of its trade secrets. (*Id*. ¶ 60.)

Mission Measurement contends that despite MicroEdge's representations and conduct, the LOI was a setup. (*Id*. ¶ 62.) Instead of acting in good faith, MicroEdge, the Individual Defendants, Sagemount, and Vista Management embarked on an intentional and consistent strategy of delay and obfuscation in their communications with Mission Measurement. (*Id*.) According to Plaintiff, MicroEdge and the Individual Defendants continued to engage with Mission Measurement for the purpose of keeping Mission Measurement out of the market as a competitor for outcomes-related products and services. (*Id*.)

On September 3, 2014, Vanek, who was MicroEdge's Vice President of Business Development at that time, forwarded a news report to Mission Measurement's Saul stating Blackbaud bought MicroEdge for $160 million. (*Id*. ¶ 70.) In that correspondence, Vanek told Saul to call him because they "should talk rather than write" and that the "radio silence over the last several months was due to this deal." (*Id*.) During a follow-up telephone conversation on September 5, 2014, Vanek told Saul that the acquisition was a "good thing" for Mission Measurement and that Vanek expected that their joint product would be brought to market even more successfully with Blackbaud's large user base and support. (*Id*.) At no time during the call, or on any of their prior calls, had Vanek terminated the LOI nor did Vanek state that Defendants would not honor their promise to share in the revenue of their joint product. (*Id*. ¶ 71.) Following the acquisition by Blackbaud, MicroEdge employees, including but not limited to Vanek and Nimsger, communicated Mission Measurement's proprietary information to Blackbaud and informed Blackbaud employees of a contractual relationship with Mission

Measurement.  (*Id*.)  At this time, if not earlier, Blackbaud learned of the NDA, the

Confidentiality Agreement, the LOI, and the oral agreement executed between Mission

Measurement and MicroEdge.  (*Id*.)

According to Mission Measurement, Blackbaud's acquisition of MicroEdge – announced

in September 2014 – resulted in Blackbaud paying an inflated price of $160 million for

MicroEdge.  (*Id*. ¶ 75.)  Mission Measurement alleges that Vista Management, Sagemount, and

the Individual Defendants manipulated the sale price of MicroEdge – using the relationship with

Mission Measurement, its confidential information, and its market position – to advance their

own personal economic benefit.  (*Id*.)  According to Plaintiff, due to the sale of MicroEdge to

Blackbaud, the Individual Defendants, the Vista Defendants, and Sagemount received direct

financial benefits, including that the Individual Defendants earned at least one percent of the

total purchase price of $160 million.  (*Id*. ¶ 75.)

On October 26, 2015, Mission Measurement first learned that Defendants MicroEdge and

Blackbaud went to market with an outcomes product without Mission Measurement.  (*Id*. ¶ 77.)

In particular, MicroEdge and Blackbaud issued a press release that "unveiled its transformational

outcomes solution" featuring "a first-of-its-kind outcomes measurement taxonomy."  (*Id*.)  Also,

in the fall of 2015, MicroEdge began marketing the jointly-developed software solution without

Mission Measurement's previous knowledge or permission.  (*Id*.)

## ANALYSIS

I.     **Personal Jurisdiction Challenges**

The Vista Defendants and all of the Individual Defendants – except for MicroEdge's

President Phil Montgomery – challenge the Court's personal jurisdiction over them.  The Defend

Trade Secrets Act does not have nationwide service of process that would confer personal

jurisdiction over all Defendants, therefore, the Court may exercise personal jurisdiction over Defendants only if personal jurisdiction would be proper in an Illinois court. *See Advanced Tactical Ordnance Sys., LLC v. Real Action Paintball, Inc.,* 751 F.3d 796, 800 (7th Cir. 2014); Fed.R.Civ.P. 4(k)(1)(C). "Illinois's long-arm statute permits its courts to exercise personal jurisdiction to the fullest extent allowed by the Illinois and U.S. Constitutions." *KM Enter., Inc. v. Glob. Traffic Techs., Inc.,* 725 F.3d 718, 732 (7th Cir. 2013). "Because Illinois permits personal jurisdiction if it would be authorized by either the Illinois Constitution or the United States Constitution, the state statutory and federal constitutional requirements merge." *uBID, Inc. v. GoDaddy Grp., Inc.,* 623 F.3d 421, 425 (7th Cir. 2010); *see also Northern Grain Mktg.,* 743 F.3d at 492 ("the statutory question merges with the constitutional one – if Illinois constitutionally may exercise personal jurisdiction over a defendant, its long-arm statute will enable it to do so.").

Mission Measurement asserts that it can establish personal jurisdiction over the Individual Defendants and the Vista Defendants based on specific jurisdiction, which grows out of "the relationship among the defendant, the forum, and the litigation." *Walden v. Fiore,* 134 S.Ct. 1115, 1121 (2014). The primary focus of the Court's specific jurisdiction inquiry is the non-resident defendants' relationship with Illinois. *Bristol-Myers Squibb Co. v. Superior Court of Ca., San Francisco Cnty.,* 137 S. Ct. 1773, 1779 (2017). In particular, "specific jurisdiction 'refers to jurisdiction over a defendant in a suit arising out of or related to the defendant's contacts with the forum.'" *Brook*, 873 F.3d at 552 (citation omitted). "Only intentional contacts by the defendant with the forum jurisdiction can support specific jurisdiction," *Noboa v. Barcelo Corporacion Empresarial, SA,* 812 F.3d 571, 572 (7th Cir. 2016), accordingly, "a defendant's relationship with a plaintiff or third party, standing alone, is an insufficient basis for

jurisdiction." *Walden,* 134 S. Ct. at 1123. Also, "[s]pecific jurisdiction requires a defendant's contacts with the forum State to be directly related to the conduct pertaining to the claims asserted." *Brook*, 873 F.3d at 552.

### A.    Individual Defendants

Here, Mission Measurement argues that the Court has specific jurisdiction over certain MicroEdge employees, who purposefully directed their efforts toward Mission Measurement in Illinois to advance the commercial relationship between MicroEdge and Mission Measurement concerning the joint development of the new software application. *See Walden*, 134 S.Ct. at 1123 ("A forum State's exercise of jurisdiction over an out-of-state intentional tortfeasor must be based on intentional conduct by the defendant that creates the necessary contacts with the forum."). More specifically, Mission Measurement alleges that Charles Vanek, MicroEdge's former Vice President of Business Development, traveled to Chicago in 2012 to engage in contract discussions and product development with Mission Measurement. (Second Am. Compl. ¶¶ 26, 84.) Mission Measurement also contends that Vanek and other members of MicroEdge's development team came to Chicago in February 2013 and engaged in a brain-storming session related to the joint development of their software product. (*Id.* ¶ 54.) Further, Mission Measurement asserts that MicroEdge had a quarterly board meeting to discuss MicroEdge's product development efforts, among other topics, in Chicago during December 2013 that Vanek attended. (*Id.* ¶ 56.) Additionally, Vanek communicated with Mission Measurement via telephone and email on numerous occasions, including emailing Mission Measurement's CEO about Blackbaud's purchase of MicroEdge in September 2014. (*Id.* ¶¶ 35, 64, 70, 71.) Based on these allegations, Vanek purposely directed business communications and contacts toward Mission Measurement in Illinois over a sustained period of time creating a substantial connection

between Vanek and Illinois in relation to this lawsuit.  *See, e.g., Montel Aetnastak, Inc. v. Miessen,* 998 F. Supp. 2d 694, 710 (N.D. Ill. 2014); *Abbott Labs., Inc. v. BioValve Techs., Inc.,* 543 F. Supp. 2d 913, 921 (N.D. Ill. 2008).  That Vanek contacted Mission Measurement via telephone and email does not change this analysis because "[i]t is an inescapable fact of modern commercial life that a substantial amount of business is transacted solely by mail and wire communications across state lines, thus obviating the need for physical presence within a State in which business is conducted."  *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 476 (1985) ("we have consistently rejected the notion that an absence of physical contacts can defeat personal jurisdiction").  Accepting the well-pleaded facts in the Second Amended Complaint as true, Mission Measurement has fulfilled its burden of establishing a prima facie case of specific personal jurisdiction over Vanek.  *See Northern Grain Mktg.,* 743 F.3d at 491; *Purdue Research Found. v. Sanofi-Synthelabo, S.A.,* 338 F.3d 773, 782 (7th Cir. 2003).

Similarly, based on Mission Measurement's allegations, MicroEdge's former CEOs had purposeful contacts with Illinois directly related to the joint development of the outcomes-based software.  Preston McKenzie – who Mission Measurement alleges is presently the CEO of Newscycle Solutions, a portfolio company of Vista Management – made promises, engaged in numerous conversations with Mission Measurement, sought a partnership with Mission Measurement, and nurtured the relationship between MicroEdge and Mission Measurement in order to jointly develop the outcomes-based software product.  (Second Am. Compl. ¶¶ 11, 26, 35-38, 40.)  McKenzie also signed the June 26, 2012 Confidentiality Agreement between MicroEdge and Mission Measurement, as well as the parties' January 2013 LOI.  (R. 75-1, Ex. 1, 6/26/12 Confidentiality Agreement, at 5; R. 16, Ex. A, LOI.)  Likewise, Kristin Nimsger, also a former MicroEdge CEO, traveled to Illinois on multiple occasions to conduct litigation-specific

business in relation to the outcomes-based software. (*Id.* ¶¶ 25, 26, 56, 65.) Nimsger, who is currently employed by Social Solutions Global, a portfolio company of Vista Management, communicated with Mission Measurement's CEO on a regular basis in the context of the parties' ongoing business arrangement and various contracts via email and telephone. (*Id.* ¶¶ 14, 63, 64; R. 75-3, Ex. 2, May 2014 email string.) Under these circumstances, Nimsger's and McKenzie's willing and ongoing communications and contacts with Mission Measurement to develop the outcomes-based software fulfill the minimum contacts requirement for the Court to exercise specific personal jurisdiction over them. *See Brooks*, 873 F.3d at 552-53 ("the relationship must arise out of contacts that the defendant *himself* creates with the forum State," and "the defendant's contacts with the forum State itself.") (emphasis in original).

On the other hand, Mission Measurement has failed in its burden of adequately alleging that the Court has specific personal jurisdiction over the other Individual Defendants, who are former MicroEdge employees, including Todd Laddusaw, Benny Melumad, and Scott Adkins. To clarify, Mission Measurement explains that Laddusaw, Melumad, and Adkins traveled to Chicago for a MicroEdge board meeting in December 2013 or otherwise traveled to Chicago in relation to the development of the outcomes software. (*Id.* ¶¶ 25, 40, 56.) Mission Measurement, however, does not provide details about the roles these individuals played in initiating or nurturing the joint development of the software or their titles and duties with MicroEdge to give context to their involvement in the joint business relationship. There is no indication from the Second Amended Complaint, for example, that Laddusaw, Melumad, or Atkins had any specific discussions with Mission Measurement personnel about the joint development of the software at issue in this lawsuit. Without more, Mission Measurement's allegations of Laddusaw's, Melumad's, or Atkins' contacts with Illinois are too attenuated to

connect them to Illinois in a meaningful way in relation to this lawsuit. *See Walden,* 134 S.Ct. at 1122-23; *Burger King,* 471 U.S. at 475. As such, the Court dismisses Todd Laddusaw, Benny Melumad, and Scott Adkins without prejudice from this lawsuit for lack of personal jurisdiction.

Mission Measurement's allegations concerning former MicroEdge employees Rachel Arnold and Joel Martins are even more attenuated. In particular, Mission Measurement asserts that Arnold traveled to Illinois and conducted business in Illinois related to advancing MicroEdge's value as a portfolio company of Vista Management. (*Id.* ¶ 27.) Plaintiff further alleges that Joel Martins traveled to Illinois and conducted business in Illinois related to MicroEdge's relationship with Mission Measurement. (*Id.* ¶ 28.) As above, these vague, bare-boned allegations do not supply enough factual details to satisfy Mission Measurement's burden of establishing a prima face case of specific personal jurisdiction. *See Mohammed v. Uber Techs., Inc.*, 237 F. Supp. 3d 719, 733 (N.D. Ill. 2017) ("[w]here factual assertions amount only to vague generalizations or unsupported allegations, they are not enough to support personal jurisdiction."). The Court therefore dismisses Defendants Joel Martins and Rachel Arnold without prejudice from this lawsuit for lack of personal jurisdiction.

### B.     Fiduciary Shield Doctrine

Next, Vanek, Nimsger, and McKenzie argue that they are shielded from personal jurisdiction through the fiduciary shield doctrine. "[R]ecognized by the courts of many states including Illinois," the fiduciary shield doctrine "denies personal jurisdiction over an individual whose presence and activity in the state in which the suit is brought were solely on behalf of his employer or other principal." *Rice v. Nova Biomedical Corp.,* 38 F.3d 909, 912 (7th Cir. 1994). "Illinois employs the fiduciary-shield doctrine, under which a person who enters the state solely as fiduciary for another may not be sued in Illinois." *ISI Int'l, Inc. v. Borden Ladner Gervais*

*LLP*, 256 F.3d 548, 550 (7th Cir. 2001) (citation omitted). As the Supreme Court of Illinois

explains, where a defendant's conduct in Illinois "was a product of, and was motivated by, his

employment situation and not his personal interests ... it would be unfair to use this conduct to

assert personal jurisdiction over him as an individual." *Rollins v. Ellwood*, 141 Ill. 2d 244, 280

(1990). Nonetheless, the "shield is withdrawn if the agent was acting also or instead on his own

behalf – to 'serve his personal interest[.]'" *Rice,* 38 F.3d at 912 (quoting *Rollins*, 141 Ill.2d at

280). The Court recognizes that "[s]everal courts of this district have found that the doctrine

does not protect a defendant who has decision-making authority and a financial stake in the

company that directed him or her to a jurisdiction." *See Orgone Capital III, LLC v.*

*Daubenspeck*, No. 16 C 10849, 2017 WL 3087730, at *7 (N.D. Ill. July 20, 2017) (listing cases).

In short, if an employee has control over his own duties, namely, is a decision-maker for the

company, and acts in his own personal interest, the fiduciary shield doctrine does not prevent the

Court from taking personal jurisdiction over that employee. *See Hach Co. v. Hakuto Co., Ltd.,*

784 F.3d 2d 977, 984 (N.D. Ill. 2011).

Viewing the allegations as true, Mission Measurement has sufficiently alleged that

MicroEdge's former CEOs Kristin Nimsger and Preston McKenzie, along with MicroEdge's

former Vice President of Business Development Charles Vanek, not only were decision-makers

for MicroEdge, but that Vanek, Nimsger, and McKenzie each had a personal financial interest in

MicroEdge's relationship with Mission Measurement, namely, that they held equity interests in

MicroEdge. In addition, Mission Measurement alleges that these Individual Defendants were

financially motivated to develop and maintain a relationship between MicroEdge and Mission

Measurement because they would earn at least one percent of the total purchase price of $160

million that Blackbaud paid to acquire MicroEdge. *See Scherr v. W. Sky Fin., LLC*, 77 F. Supp.

3d 770, 775 (N.D. Ill. 2015) ("Courts look to whether the defendant's actions were discretionary and whether personal gain motivated the actions."). Based on these allegations, the fiduciary shield doctrine does not apply to Nimsger, McKenzie, and Vanek.

### C. Vista Defendants

As to personal jurisdiction over the Vista Entities, Mission Measurement argues that Vista Management and its two funds were strongly tied to Mission Measurement through Vista Management's ownership of MicroEdge. More specifically, Mission Measurement alleges that Alan Cline, a Principal at Vista Management, contacted Mission Measurement's CEO in February 29, 2012 seeking its assistance in helping MicroEdge develop a way to measure outcomes. Mission Measurement states that over a two-year period, Vista Management was actively involved in MicroEdge's management decisions and that Vista Management facilitated the relationship between Vista Management's portfolio company, MicroEdge, and Mission Measurement. After Mission Measurement and MicroEdge entered into their agreements, Vista Management participated in various negotiations and conversations between MicroEdge and Mission Measurement. Further, Mission Measurement alleges, upon information and belief, that Vista Management and MicroEdge knew that MicroEdge had little or no knowledge or experience in measuring outcomes from philanthropic programs and that they needed Mission Measurement's expertise. Moreover, Mission Measurement contends that Vista Management's Cline made representations to it that MicroEdge would share in the revenues from their joint software product. Mission Measurement also states that Vista Management, directly or through intermediaries, transmitted, shipped, distributed, offered for sale, sold, or advertised their products and services in Illinois. Mission Measurement maintains that Vista Management was involved with the process of cutting it out of any actual relationship with MicroEdge in the

summer of 2014 prior to the sale of MicroEdge.  In addition, Mission Measurement alleges that Vista Management has an office in Chicago.  (*Id.* ¶¶ 24, 66.)  Indeed, Vista Management's website indicates that it has an office at 2 Prudential Plaza, 180 North Stetson Avenue in Chicago, Illinois.[1]

Accepting these allegations as true, Mission Measurement has set forth detailed facts that non-resident Vista Management's suit-related conduct was purposely directed at Illinois.  Simply put, Vista Management's contacts with Illinois were not "random, fortuitous, or attenuated," *Burger King,* 471 U.S. at 475, especially because Vista Management has an office in Chicago and that an employee of Vista Consulting Group in Illinois – an affiliate of Vista Management – communicated with certain Individual Defendants to discuss the valuation of MicroEdge's outcomes offering in 2014 prior to the sale to Blackbaud.  (*Id.* ¶ 66.)  Equally important, Vista Management was an integral part of fostering the relationship between MicroEdge and Mission Measurement concerning their joint development of the outcomes software.  Based on these constitutionally sufficient contacts with Illinois, Mission Measurement has established a prima facie case of personal jurisdiction over Vista Management.

On the contrary, Mission Measurement has not established a prima facie case of personal jurisdiction over the two Vista funds.  To clarify, Mission Measurement argues that Vista Management's conduct can be imputed to the two Vista funds named as Defendants in this lawsuit.  Mission Measurement, however, does not develop this argument nor support it with legal authority.  As such, Mission Measurement has failed to establish personal jurisdiction over the Vista funds.  *See M.G. Skinner & Assocs. Ins. Agency, Inc. v. Norman-Spencer Agency, Inc.,* 845 F.3d 313, 321 (7th Cir. 2017) ("Perfunctory and undeveloped arguments are waived, as are

---

[1] https://www.vistaequitypartners.com/contact-us/ (last visited on December 13, 2017).

arguments unsupported by legal authority.").  Thus, the Court dismisses Defendants Vista I Fund and Vista I-A Fund without prejudice for lack of personal jurisdiction.

## II.     Personal Liability

Next, Vista Management and the remaining Individual Defendants, including Phil Montgomery, argue that they are not liable for MicroEdge's alleged misconduct because under New York law, members, managers, and agents of an LLC are not liable for any debts, obligations, or liabilities of the LLC.[2]  *See LeBoeuf, Lamb, Greene & MacRae, L.L.P. v. Worsham,* 185 F.3d 61, 66 (2d Cir. 1999) ("New York law, like that of other states, also recognizes that officers and directors are, in general, not liable for the debts of the corporation."). Nevertheless, "while corporate officers generally cannot be held personally liable on contracts of their corporations, personal liability will be found for tortious conduct in which they participate, regardless of whether their actions are taken for the benefit of the corporation." *MTV Networks v. Lane,* 998 F. Supp. 390, 394 (S.D.N.Y. 1998).  In other words, a corporate officer or director "is not personally liable for his corporation's contractual breaches unless he assumed personal liability, acted in bad faith or committed a tort in connection with the performance of the contract." *Mills v. Polar Molecular Corp.,* 12 F.3d 1170, 1177 (2d Cir. 1993); *see also Cohen v Koenig,* 25 F.3d 1168, 1173 (2d Cir. 1994) ("[o]fficers and directors of a corporation may be held liable for fraud if they participate in it or have actual knowledge of it") (citation omitted). Therefore, under New York law, a corporate officer may be held liable "for inducing [the] corporation to violate its contractual obligations" where the officer's "activity involves separate

---

[2]  The parties do not dispute that New York law governs this particular analysis because MicroEdge was organized under the laws of New York.  "Courts do not worry about conflicts of laws unless the parties disagree on which state's law applies." *Auto–Owners Ins. Co., v. Webslov Computing, Inc.,* 580 F.3d 543, 547 (7th Cir. 2009).

tortious conduct or results in personal profit." *Stern v. H. DiMarzo, Inc.,* 77 A.D.3d 730, 731, 909 N.Y.S.2d 480, 481 (N.Y. App. Div. 2010) (collecting cases).

As discussed in relation to the fiduciary shield doctrine, Mission Measurement has sufficiently alleged that MicroEdge's former CEOs Kristin Nimsger and Preston McKenzie, along with MicroEdge's former Vice President of Business Development Charles Vanek, each had a personal financial interest in MicroEdge's relationship with Mission Measurement as it relates to this lawsuit. Not only did the alleged misconduct relate to the joint development of the outcomes software, the allegedly tortious conduct resulted in them earning at least one percent of the total purchase price of $160 million when Blackbaud purchased MicroEdge in 2014. Similarly, the allegations concerning MicroEdge's President Phil Montgomery also reflect that his tortious conduct resulted in his own personal profit due to the sale of MicroEdge in 2014. Assuming that Vista Management is a member, manager, or agent of MicroEdge, Mission Measurement has alleged enough factual details that Vista Management, via Alan Cline and others, had control over MicroEdge's conduct and profited from that conduct by selling MicroEdge for the allegedly inflated price of $160 million. Accordingly, Vista Management's and Individual Defendants' argument that they cannot be held liable for MicroEdge's alleged misconduct is without merit. The Court now turns to Plaintiff's claims as alleged in the Second Amended Complaint.

III. **Breach of Contract Claims Against MicroEdge**

In Count I, Mission Measurement alleges that MicroEdge breached the Confidentiality Agreement dated June 26, 2012, which is governed by Illinois law, and in Count II, Mission Measurement alleges that MicroEdge breached the parties' January 2013 LOI, which is governed

by New York law. Also, in Count VI, Mission Measurement brings a breach of contract claim based on the parties' oral contract.

When construing a contract under New York law, the court's primary objective "is to give effect to the intent of the parties as revealed by the language of their agreement." *Chesapeake Energy Corp. v. Bank of New York Mellon Trust Co.,* 773 F.3d 110, 113 (2d Cir. 2014) (citation omitted). "[T]he words and phrases should be given their plain meaning, and the contract should be construed so as to give full meaning and effect to all of its provisions." *Olin Corp. v. Am. Home Assur. Co.,* 704 F.3d 89, 99 (2d Cir. 2012) (internal quotation marks omitted). Likewise, "[u]nder Illinois law, the goal of contract interpretation is to ascertain the parties' intent and, in doing so, we first look to 'the plain and ordinary meaning' of the contract language." *Selective Ins. Co. of S.C. v. Target Corp.,* 845 F.3d 263, 267 (7th Cir. 2016) (citations and quotations omitted). Illinois courts construe the contract "as a whole, viewing each part in light of the others." *Aeroground Inc. v. CenterPoint Properties Trust,* 738 F.3d 810, 813 (7th Cir. 2013). Under both New York and Illinois law, courts interpret unambiguous contracts as a matter of law. *See In re Duckworth*, 776 F.3d 453, 456 (7th Cir. 2014); *Fishoff v. Coty Inc.,* 634 F.3d 647, 652 (2d Cir. 2011).

### A.    Breach of Confidentiality Agreement – Count I

MicroEdge first argues that the LOI's merger clause bars Mission Measurement's breach of contract claim based on the parties' June 2012 Confidentiality Agreement. In support of its argument, MicroEdge points to the following language in the LOI: "This letter constitutes the entire understanding and agreement between the parties hereto and their affiliates with respect to its subject matter and supersedes all prior or contemporaneous agreements, representations, warranties and understandings of such parties (whether oral or written)." (LOI § 13.) The LOI's

subject matter includes that "MicroEdge and Mission Measurement will collaborate to create a product consisting of software combining Mission Measurement's Outcomes Taxonomy and MicroEdge accounting." (*Id.* § 1(a).) The LOI also states that the "terms and conditions of this Agreement will be deemed to be the Confidential Information of each Party and will not be disclosed without the written consent of the other Party." (*Id.* § 8.) Immediately prior to the merger clause, the LOI states: "The Confidentiality Agreement is hereby ratified and confirmed as a separate agreement between the parties thereto." (*Id*. § 12.)

Based on the plain, unambiguous language of the LOI, the Confidentiality Agreement is a prior, separate agreement that the LOI supersedes pursuant its merger clause. *See Eisen v. Venulum Ltd.,* 244 F. Supp. 3d 324, 334 (W.D.N.Y. 2017) ("The terms of the merger clause do not evince only a desire to have the parol evidence rule fully applied; the language states an intention of the parties to completely replace and 'supersede' any prior agreement[.]"); *see also Applied Energetics, Inc. v. NewOak Capital Markets, LLC,* 645 F.3d 522, 526 (2d Cir. 2011) ("Under New York law, '[i]t is well established that a subsequent contract regarding the same matter will supersede the prior contract.'") (citation omitted); *Midwest Builder Distrib., Inc. v. Lord & Essex, Inc.,* 383 Ill. App. 3d 645, 662 (1st Dist. 2007) (when an integration "clause is present, Illinois courts will accept it at face value as an expression of the parties' will that the written contract be the final deal."); *Magnus v. Lutheran Gen. Health Care Sys.,* 235 Ill. App. 3d 173, 182 (1st Dist. 1992) ("It is well settled under the doctrine of merger and the parol evidence rule that a written agreement that is complete on its face supersedes all prior agreements on the same subject matter and bars the introduction of evidence concerning any prior term or agreement on that subject matter particularly when the contract contains an unambiguous merger or integration clause.") (internal citations omitted).

This reading is consistent when construing the LOI as a whole, especially because there is no language in the contract expressly incorporating the Confidentiality Agreement. *See Gore v. Alltel Commc'ns, LLC,* 666 F.3d 1027, 1033 (7th Cir. 2012) ("one contract incorporates another only if there is 'an express intent to incorporate.'") (citation omitted); *Aceros Prefabricados, S.A. v. TradeArbed, Inc.,* 282 F.3d 92, 97 (2d Cir. 2002) ("Applying New York law, we have found that '[p]arties to a contract are plainly free to incorporate by reference, and bind themselves inter sese to, terms that may be found in other agreements.'") (citation omitted); *Valley Stream Foreign Cars, Inc. v. Am. Honda Motor Co.,* 209 F. Supp. 3d 547, 552-53 (E.D.N.Y. 2016) ("Under New York law, '[t]he doctrine of incorporation by reference requires that the paper to be incorporated into the written instrument by reference must be so described in the instrument that the paper may be identified beyond all reasonable doubt.'") (citation omitted). Instead, as highlighted above, the LOI unequivocally identifies the Confidentiality Agreement as a separate agreement.

Mission Measurement nevertheless argues that the Court should interpret the June 2012 Confidentiality Agreement and January 2013 LOI together because they are part of the same transaction. Under New York law, "[w]hether multiple writings should be construed as one agreement depends upon the intent of the parties." *TVT Records v. Island Def Jam Music Grp.,* 412 F.3d 82, 89 (2d Cir. 2005) (citation omitted); *see also U.S. Data Corp. v. RealSource, Inc.,* 910 F. Supp. 2d 1096, 1105 (N.D. Ill. 2012) (Under Illinois law "separate contracts executed by the same parties as part of the same transaction may be viewed collectively as a single agreement, depending on the intent of the parties"); *First Nat'l Ins. Co. of Am. v. Joseph R. Wunderlich, Inc.,* 358 F. Supp. 2d 44, 54 (N.D.N.Y. 2004) ("As a general proposition, two separate written agreements executed at the same time may be considered in law as one

agreement but only if the parties intended such a merger of terms and concepts and desired interdependence.").  Here, the parties' intent is clear from the unambiguous language in the LOI's merger clause, which states that the LOI "supersedes all prior or contemporaneous agreements, representations, warranties and understandings of such parties (whether oral or written)."

Finally, Mission Measurement argues that because the LOI expressly refers to the Confidentiality Agreement and ratifies its existence, the parties' intent is that the Confidentiality Agreement and the LOI are a unitary agreement.  Otherwise, Mission Measurement maintains, the clause stating – "The Confidentiality Agreement is hereby ratified and confirmed as a separate agreement between the parties thereto" – would be rendered superfluous.  This clause, however, is not superfluous because the LOI recognizes that the Confidentiality Agreement is a ratified and separate agreement and in the paragraph immediately following this statement, the LOI expressly states that it supersedes all prior agreements.  In fact, Mission Measurement's reading of the LOI would render the merger clause meaningless.  *See Olin Corp. v. OneBeacon Am. Ins. Co.,* 864 F.3d 130, 148 (2d Cir. 2017) ("Any interpretation of a contract that 'has the effect of rendering at least one clause superfluous or meaningless ... is not preferred and will be avoided if possible.'") (citation omitted); *Selective Ins. Co. of S.C. v. Target Corp.,* 845 F.3d 263, 267 (7th Cir. 2016) (Illinois courts "must seek to give effect to each clause and word used, without rendering any terms meaningless").  For these reasons, the Court grants MicroEdge's motion to dismiss Count I with prejudice.

### B.    Breach of LOI – Count II

Next, MicroEdge argues that the LOI expired on May 1, 2013 according to § 12 of the LOI, and thus Mission Measurement cannot bring a breach of contract claim based on this

expired agreement.  Section 12 states in relevant part:  "It is the intention of the parties that they will negotiate in good faith and execute the final Agreement by May 1, 2013.  In the event that the parties are unable to conclude a final Agreement by that date, this LOI and the intentions set forth herein shall expire."  (LOI § 12.)  Mission Measurement, however, asserts that another provision in the LOI, specifically § 4, allows for the parties to terminate the agreement if they failed to enter into a final agreement on or before May 1, 2013.  Based on § 4, Mission Measurement asserts that the LOI did not expire until October 2015 – when Blackbaud launched "Blackbaud Outcomes" – which was the first time Mission Measurement received notice that the joint development efforts were terminated.  Section 4 states in pertinent part:

> Both parties mutually agree that a Master Agreement will be executed by the parties no later than May 1, 2013.  Should [the] parties fail to enter into a Master Agreement on or before May 1, 2013, either party may elect to terminate this LOI and other agreements.

(LOI § 4.)

Under New York's general cannons of contract construction, "where two seemingly conflicting contract provisions reasonably can be reconciled, a court is required to do so and to give both effect."  *Seabury Const. Corp. v. Jeffrey Chain Corp.,* 289 F.3d 63, 69 (2d Cir. 2002); *see also Israel v. Chabra,* 537 F.3d 86, 99 (2d Cir. 2008).  Other cannons of contract construction in New York include that when resolving irreconcilable differences between contract clauses, courts should enforce the clause that is more important or principal to the contract and that the more specific clause controls the more general one.  *See Israel v. Chabra*, 601 F.3d 57, 63 (2d Cir. 2010); *Israel v. Chabra,* 12 N.Y.3d 158, 168 n.3 (N.Y. 2009) (quoting 11 Lord, Williston on Contracts § 32:15 (4th ed. 2009)).  Unfortunately, neither MicroEdge nor Mission Measurement discusses these cannons of contract construction in their briefs.  Additionally, at this stage of the proceedings, neither party has established that its interpretation

of the Agreement is the only reasonable interpretation. *See Maven Techs., LLC v. Vasile,* 147 A.D.3d 1377, 1378 (N.Y. App. Div. 2017). Under the circumstances, and at this procedural posture, the Court denies MircoEdge's motion to dismiss Mission Measurement's breach of contract claim as alleged in Count II.[3]

### C.  Breach of Oral Contract – Count VI

MicroEdge further argues that Mission Measurement has failed to adequately allege its breach of contract claim based on the parties' oral contract under the federal pleading standards. "The elements of a cause of action for breach of a contract, whether oral or written, 'include the existence of a valid and enforceable contract, performance by the plaintiff, breach of the contract by the defendant, and resultant damages or injury to the plaintiff.'" *Sheth v. SAB Tool Supply Co.,* 990 N.E.2d 738, 754 (1st Dist. 2013); *see also Dual–Temp of Ill., Inc. v. Hench Control, Inc.,* 821 F.3d 866, 869 (7th Cir. 2016).

Despite MicroEdge's argument to the contrary, and construing the facts and all reasonable inferences in Mission Measurement's favor, Mission Measurement has sufficiently alleged a breach of contract claim based on the parties' oral contract under the federal pleading standards. *See Iqbal,* 556 U.S. at 678 (complaint is plausible on its face when plaintiff alleges "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."). Specifically, Plaintiff alleges that despite being unable to complete a written agreement covering their joint product, the parties entered into an oral agreement for continued joint development efforts with the understanding that there would be a sharing of royalties and ownership. (Second Am. Compl. ¶ 49.) Plaintiff further alleges that by their course of performance and oral affirmations, the parties mutually agreed to be bound by an

---

[3] MicroEdge's perfunctory argument concerning other language in § 4 of the LOI, which it made in a footnote of its reply brief, is waived. *See Evergreen Square of Cudahy v. Wisconsin Hous. & Econ. Dev. Auth.,* 848 F.3d 822, 829 (7th Cir. 2017).

oral agreement and that the oral agreement included the following terms: (1) continued good faith efforts to jointly develop a software product which embodied Mission Measurement's Outcomes Taxonomy $^{TM}$; (2) the software product would be jointly owned by the parties; (3) Mission Measurement would retain ownership of the Outcomes Taxonomy $^{TM}$; and (4) the parties would share royalties related to the sale of the software product.  (*Id.* ¶ 50.)  According to Mission Measurement, the parties further agreed that neither party would misuse any confidential information learned from the other party.  (*Id.*)  Furthermore, Plaintiff alleges that it performed under the contract by staying out of the market during its joint project with MicroEdge.  (*Id.* ¶¶ 56, 122.)  Mission Measurement states that MicroEdge breached the parties' agreement by disclosing confidential information and proprietary information to Blackbaud and other third-parties.  (*Id.* ¶ 87.)  Plaintiff also maintains that MicroEdge breached the parties' contract by refusing to acknowledge Mission Measurement's joint ownership of the outcomes-related software product and has also breached the contract by failing to pay Mission Measurement its shares of the revenues.  (*Id.* ¶ 123.)  Further allegations indicate that Mission Measurement has suffered damages through the loss of royalties, ownership of the joint product, and MicroEdge capitalizing on the first mover advantage.  (*Id.* ¶¶ 87, 88.)

Moreover, MicroEdge's reliance on Illinois case law to support its argument that Mission Measurement failed to sufficiently allege its breach of contract claim under the federal pleading standards is misplaced.  *See Gacek v. American Airlines, Inc.,* 614 F.3d 298, 301–02 (7th Cir. 2010) ("Under the *Erie* doctrine, federal courts in diversity cases (and any other cases in which state law supplies the rule of decision) apply state 'substantive' law but federal 'procedural' law.").  As the Seventh Circuit recently reiterated, "[e]ver since their adoption in 1938, the Federal Rules of Civil Procedure have required plaintiffs to plead claims rather than facts

corresponding to the elements of a legal theory." *Chapman v. Yellow Cab Coop.,* 875 F.3d 846, 848 (7th Cir. 2017). Last, the Court reminds the parties that arguments made for the first time in a reply brief are waived. *See Stechauner v. Smith,* 852 F.3d 708, 721 (7th Cir. 2017). The Court therefore denies MicroEdge's motion to dismiss Count VI of the Second Amended Complaint.

## IV.    Illinois Trade Secret Act – Preemption

Defendants further argue that the Illinois Trade Secret Act ("ITSA") preempts Mission Measurement's remaining Illinois common law claims. Section 8(a) of the ITSA states that "this Act is intended to displace conflicting tort, restitutionary, unfair competition, and other laws of this State providing civil remedies for misappropriation of a trade secret." *Hecny Transp., Inc. v. Chu,* 430 F.3d 402, 404-05 (7th Cir. 2005) (quoting 765 ILCS 1065/8). The ITSA, however, "does not affect contractual remedies, whether or not based upon misappropriation of a trade secret[,]" *see* 765 ILCS 1065/8(b)(1), or "other civil remedies that are not based upon misappropriation of a trade secret.'" 765 ILCS 1065/8(b)(2); *see also Hecny Transp.*, 430 F.3d at 404 ("This statute abolishes claims other than those based on contract arising from misappropriated trade secrets, replacing them with claims under the Act itself."). "The dominant view is that claims are foreclosed only when they rest on the conduct that is said to misappropriate trade secrets." *Hecny Transp.,* 430 F.3d at 404-05. As such, the pertinent question is whether the claim is based solely on the misappropriation of a trade secret or whether the claim seeks recovery for wrongs beyond the misappropriation. *See American Ctr. for Excellence in Surgical Assisting Inc. v. Cmty. Coll. Dist. 502,* 190 F. Supp. 3d 812, 823 (N.D. Ill. 2016); *Lumenate Techs., LP v. Integrated Data Storage,* LLC, No. 13 C 3767, 2013 WL 5974731, at *7 (N.D. Ill. Nov. 11, 2013); *see also IPOX Schuster, LLC v. Nikko Asset Mgmt.*

*Co.,* 191 F. Supp. 3d 790, 802 (N.D. Ill. 2016) ("the question has been whether the claim would lie if the information at issue were not confidential.").

In general, Mission Measurement argues that its Illinois common law claims are based on Defendants' scheme to prevent it from developing an outcomes-based software product and enter the marketplace with its own product or develop a product with one of MicroEdge's competitors – and not the misappropriation of its trade secrets. In order to address Defendants' arguments, the Court must separately consider the remaining common law claims to determine whether these claims seek recovery for wrongs beyond the alleged misappropriation of Mission Measurement's trade secrets. *See Fire 'Em Up, Inc. v. Technocarb Equip.*, 799 F. Supp. 2d 846, 852 (N.D. Ill. 2011) ("[T]he ITSA preemption provision 'does not apply to duties imposed by law that are not dependent upon the existence of competitively significant secret information.'") (quoting *Hecny Transp.,* 430 F.3d at 405).

## A.     Promissory Estoppel – Count V

In Count V of the Second Amended Complaint, Mission Measurement brings a promissory estoppel claim against MicroEdge. To establish a promissory estoppel claim under Illinois law, a plaintiff eventually must show that "(1) defendant made an unambiguous promise to plaintiff, (2) plaintiff relied on such promise, (3) plaintiff's reliance was expected and foreseeable by defendants, and (4) plaintiff relied on the promise to its detriment." *Firestone Fin. Corp. v. Meyer,* 796 F.3d 822, 827 (7th Cir. 2015); *see also Anderson v. Catholic Bishop of Chicago,* 759 F.3d 645, 651 (7th Cir. 2014) ("Under Illinois law, promissory estoppel is a theory that allows relief where a promise has been made that was relied upon by the promisee to his detriment such that it would be a fraud or injustice not to enforce the promise."). Promissory estoppel "is an alternative means of obtaining contractual relief under Illinois law," *Wigod v.*

*Wells Fargo Bank, N.A.,* 673 F.3d 547, 566 (7th Cir. 2012), that a plaintiff may plead in the alternative under Rule 8(d). *See Mission Measurement Corp. v. Blackbaud, Inc.,* 216 F. Supp. 3d 915, 922 (N.D. Ill. 2016).

In the Second Amended Complaint, Mission Measurement specifically alleges that MicroEdge made unambiguous promises to Mission Measurement, namely, that the jointly-developed software product would be jointly-owned and that the value obtained and revenues derived from this joint development would be equitably paid to Mission Measurement. (Second Am. Compl. ¶ 115.) In addition, Mission Measurement alleges that it reasonably and justifiably relied on MicroEdge's promises and conduct to its detriment, that its reliance was foreseeable to MicroEdge, and that it was damaged. (*Id.* ¶¶ 116-19.) Accepting these allegations as true and in view of the entire Second Amended Complaint, Mission Measurement has plausibly alleged its promissory estoppel claim against MicroEdge based on the promises MicroEdge made to it – not MicroEdge's alleged misappropriation of Plaintiff's trade secrets. *See Iqbal,* 556 U.S. at 679 ("Determining whether a complaint states a plausible claim for relief" is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense."). Thus, the Court denies MicroEdge's motion to dismiss Count V.

## B.     Tortious Interference Claims

### 1.     Tortious Interference with Contract – Count VIII

In Count VIII, Mission Measurement alleges a tortious interference with contract claim against Defendants Blackbaud, Vista Management, Sagemount, and the remaining Individual Defendants – Vanek, Montgomery, Nimsger, and McKenzie. Tortious inference with contract under Illinois law includes the following elements: "(1) the existence of a valid and enforceable contract between the plaintiff and another; (2) the defendant's awareness of this contractual

relation; (3) the defendant's intentional and unjustified inducement of a breach of the contract; (4) a subsequent breach by the other, caused by the defendant's wrongful conduct; and (5) damages." *Healy v. Metro. Pier & Exposition Auth.*, 804 F.3d 836, 842 (7th Cir. 2015) (quoting *HPI Health Care Servs., Inc. v. Mt. Vernon Hosp., Inc.*, 131 Ill.2d 145, 154-55 (1989)). Liability for tortious interference in Illinois is based on acts directed at the third party who breached the contract, such as conduct that prevents the party from performing the contract. *See Greene v. Mizuho Bank, Ltd.*, 206 F. Supp. 3d 1362, 1371 (N.D. Ill. 2016). Inducement means that there was "some active persuasion, encouragement, or inciting that goes beyond merely providing information in a passive way." *Pampered Chef v. Alexanian,* 804 F. Supp. 2d 765, 802 (N.D. Ill. 2011) (quotation marks and citations omitted). Additionally, a party – which includes corporate officers – cannot interfere with its own contract unless the officer's conduct is malicious or without justification, namely, that the conduct is unrelated or antagonistic to the corporation's interest. *See Nation v. Am. Capital, Ltd.,* 682 F.3d 648, 652 (7th Cir. 2012); *Service By Air, Inc. v. Phoenix Cartage & Air Freight, LLC,* 78 F. Supp. 3d 852, 864 (N.D. Ill. 2015).

As discussed above, Plaintiff has alleged the existence of a valid and enforceable oral contract – if not the LOI – and that MicroEdge breached these contracts. Therefore, the Court turns to Plaintiff's other allegations regarding the alleged tortious interference by Blackbaud, Vista Management, Sagemount, and MicroEdge's corporate officers, keeping in mind that the ITSA preempts claims based on the misappropriation of trade secrets. Viewing the allegations and all reasonable inferences in Mission Measurement's favor, it has alleged that Blackbaud, Sagemount, Vista Management, and the Individual Defendants were aware of the LOI and oral contract. (Second Am. Compl. ¶ 130.) Plaintiff also alleges that – with the intention of causing the breach of the LOI and oral agreement – these Defendants intentionally and tortiously

interfered with these contracts through their wrongful conduct. (*Id.* ¶ 131.) Specifically, Plaintiff alleges that by August 2014, Blackbaud knew of MicroEdge's ongoing contractual relationship with Mission Measurement, including that MicroEdge owed certain contractual obligations to Mission Measurement to develop a joint product, yet engaged in wrongful conduct that prevented MicroEdge's performance of its obligations to Mission Measurement, including sharing revenues and royalties with Mission Measurement. (*Id.* ¶¶ 69, 74.) Also supporting these allegations is that Blackbaud and MicroEdge purposefully placed what they claimed to be their solely-owned products and services, including "Blackbaud Outcomes," into the stream of commerce, thus cutting Mission Measurement out of any revenues or royalties as promised in the controlling contracts. (*Id.* ¶¶ 29, 79.)

As discussed under the personal jurisdiction section of this ruling, Vista Management was actively involved in MicroEdge's management decisions and facilitated the relationship between Vista Management's portfolio company, MicroEdge, and Mission Measurement. After Mission Measurement and MicroEdge entered into their agreements, Vista Management participated in various negotiations and conversations between MicroEdge and Mission Measurement that influenced MicroEdge's decisions. Based on these allegations and all reasonable inferences, Vista Management was aware of MicroEdge's contractual obligations to Mission Measurement and persuaded MicroEdge to make certain decisions in abrogation of these obligations. According to Mission Measurement, during the spring and summer of 2014, Vista Management was involved in the process of cutting Mission Measurement out of any actual relationship with MicroEdge and that Vista Management suggested to MicroEdge that it partner with Social Solutions, another Vista portfolio company and a competitor of Mission Measurement, to create an outcomes product offering. (*Id.* ¶ 66.) During this same time period,

MicroEdge's corporate officers Vanek and Nimsger traveled to Chicago to discuss MicroEdge's valuation with an affiliate of Vista Management in the context of selling MicroEdge. (*Id*.) Also, Plaintiff alleges that Vista Management, the remaining Individual Defendants, and Sagemount prevented the jointly-developed product from going to market as a joint offering of MicroEdge and Mission Measurement based on their financial interests in the sale of MicroEdge to Blackbaud. (*Id*. ¶¶ 37, 75, 153.)

As to the Individual Defendants, Mission Measurement asserts that MicroEdge's corporate officers Nimsger, Vanek, Montgomery, and McKenzie knew that MicroEdge had other plans to develop an outcomes product and no longer wished to pursue a relationship with Mission Measurement leading to an inference that they had a hand in the tortious interference with MicroEdge's contracts with Mission Measurement. (*Id.* ¶¶ 63, 88.) Additional allegations concerning Vanek's tortious interference include that he actively ceased all communications with Mission Measurement for approximately three months during Blackbaud's acquisition of MicroEdge, thereby, jeopardizing MicroEdge's contractual obligations to Mission Measurement. (*Id*. ¶¶ 64, 65.) During this time period, Nimsger traveled to Chicago for a meeting related to the Blackbaud acquisition further supporting the inference that she directly interfered with MicroEdge's contractual obligations. (*Id*. ¶ 65.) As to the four remaining Individual Defendants, including MicroEdge's President Montgomery, Plaintiff alleges that they not only knew of the joint-development plan and resulting contracts, but that they fashioned a strategy to exclude Mission Measurement from receiving any financial benefits from this joint-development plan by exerting their influence as MicroEdge's officers. (*Id.* ¶¶ 82, 88.) Prior to the Blackbaud acquisition, these individuals portrayed MicroEdge to prospective investors as having few to no outstanding commitments to Mission Measurement lending further support to the allegations that

they interfered with MicroEdge's contractual obligations. (*Id.* ¶ 67.) Mission Measurement has also asserted that these individuals had a financial interest in MicroEdge cutting Mission Measurement out of the joint-development plan, including that they each earned at least one percent of the total purchase price of $160 million that Blackbaud paid to acquire MicroEdge. That these corporate officers realized personal financial gain in relation to Blackbaud's acquisition overcomes the corporate officer privilege based on their unjustified conduct in relation to the scheme of cutting Mission Measurement out of the joint-development plan that underlies MicroEdge's alleged breach of contract. *See Nation*, 682 F.3d at 653 (corporate officer privilege overcome if defendant "induced the breach to further [its] personal goals or to injure the other party to the contract, and acted contrary to the best interest of the corporation").

As to Sagemount – a private equity firm that holds investments in MicroEdge – Plaintiff alleges that it received periodic reports on its investment with MicroEdge, which included reports of MicroEdge's partnership and dealings with Mission Measurement, which leads to a reasonable inference that Sagemount was aware of MicroEdge's contractual obligations to Mission Measurement. (*Id.* ¶ 69.) Mission Measurement asserts that Sagemount provided guidance to MicroEdge and the Individual Defendants and that it was part of an intentional strategy to delay MicroEdge's communications with Mission Measurement during Blackbaud's acquisition of MicroEdge. (*Id.* ¶¶ 51, 62.) Further, Sagemount knew of MicroEdge's ongoing contractual relationship with Mission Measurement, yet encouraged MicroEdge to prop up its value to increase Sagemount's return, leading to a reasonable inference that its conduct encouraged MicroEdge to breach its contractual obligations with Mission Measurement. (*Id.* ¶ 69, 88.) Plaintiff also alleges that Sagemount was motivated to cut Mission Measurement out of the significant financial rewards attributable to the joint product, and therefore, profited from the

sale of MicroEdge to Blackbaud. (*Id.* ¶¶ 80 82.) Assuming that Sagamount is protected under the corporate officer privilege as it argues, the alleged conduct is unjustified because the actions were motivated by financial gain to the detriment of MicroEdge's contractual obligations. *See TABFG, LLC v. Pfeil*, 746 F.3d 820, 825 (7th Cir. 2014) ("The privilege extends only to acts undertaken on behalf of the corporation, and corporate officers 'are not justified in acting solely for their own benefit or solely in order to injure the plaintiff because such conduct is contrary to the best interests of the corporation.'") (citation omitted).

Construing these allegations and all reasonable inferences in Mission Measurement's favor, it has provided enough factual details about the alleged tortious interference of contract that presents a "story that holds together." *West Bend Mut. Ins. Co. v. Schumacher,* 844 F.3d 670, 676 (7th Cir. 2016) (citing *Swanson v. Citibank, N.A.,* 614 F.3d 400, 404 (7th Cir. 2010)). Further, this claim is not preempted by the ITSA because Mission Measurement's tortious interference with contract claim is not based on its trade secrets, but on its contracts with MicroEdge and Defendants' alleged interference in MicroEdge's performance on these contracts. As such, Mission Measurement has plausibly alleged its tortious interference with contract claim under the federal pleading standards. *See Huri v. Office of the Chief Judge*, 804 F.3d 826, 834 (7th Cir. 2015) ("Defendants have fair notice of [plaintiff's] claims and the grounds upon which those claims rest, and the details in [the] Second Amended Complaint present a story that 'holds together.'"); *see also Marposs Societa Per Azioni v. Jenoptik Auto. N. Am., LLC*, ___ F.Supp. 3d ___, 2017 WL 1304110, at *5 (N.D. Ill. Apr. 7, 2017) ("'group pleading' does not violate Fed. R. Civ. P. 8 so long as the complaint provides sufficient detail to put the defendants on notice of

the claims").  The Court denies Defendants' motion to dismiss Count VIII of the Second

Amended Complaint.[4]

## 2.    Tortious Interference Prospective Economic Advantage – Count IX

In Count IX of the Second Amended Complaint, Mission Measurement brings a tortious

interference with prospective economic advantage claim against Defendants Blackbaud, Vista

Management, Sagemount, and the remaining Individual Defendants.  To give context, pursuant

to Illinois law, the elements of a tortious interference with prospective economic advantage

include:  "(1) a reasonable expectancy of entering into a valid business relationship, (2) the

defendant's knowledge of the expectancy, (3) an intentional and unjustified interference by the

defendant that induced or caused a breach or termination of the expectancy, and (4) damage to

the plaintiff resulting from the defendant's interference."  *Foster v. Principal Life Ins. Co.,* 806

F.3d 967, 971 (7th Cir. 2015) (citation omitted); *see also McCoy v. Iberdrola Renewables, Inc.,*

760 F.3d 674, 685 (7th Cir. 2014).  "Actions that form the basis of a tortious interference claim

must be directed at third-party business prospects."  *McCoy*, 760 F.3d at 686 (citation omitted).

The Court relies on the analysis directly above because the parties' arguments concerning

this tortious interference with prospective business relationships and expectancies claim have

considerable overlap with their arguments concerning the tortious interference with Mission

Measurement and MicroEdge's contracts.  That being said, Mission Measurement further alleges

that prospective business relationships and expectancies existed between it and MicroEdge,

including that jointly-developed software product would be owned by both MicroEdge and

---

[4] Defendants' attempts to add facts to Plaintiff's allegations, including that the oral agreement
was terminable at "at will," or refute them are misplaced at this stage of the proceedings.  *See
Smith v. Burge*, 222 F. Supp. 3d 669, 691 (N.D. Ill. 2016) ("defendant cannot, in presenting its
12(b)(6) challenge, attempt to refute the complaint or to present a different set of allegations");
*Leslie v. Board of Educ. for Illinois Sch. Dist. U-46,* 379 F. Supp. 2d 952, 961 (N.D. Ill. 2005)
("However eager defendant is to establish its rectitude, it may not eschew the Federal Rules and
case law by supporting its motion to dismiss with summary judgment arguments.").

Mission Measurement, and that Defendants were aware of these business expectancies. (*Id.* ¶¶ 135-37.) Plaintiff also alleges that these Defendants intentionally and tortiously interfered with these business relationships and expectancies, as well as with Plaintiff's economic advantage, through their wrongful conduct. (*Id.* ¶ 138.) As discussed, this wrongful conduct included influencing and persuading MicroEdge to cut Mission Measurement out of any revenues or royalties as promised in the controlling contracts and cutting Mission Measurement out of any actual relationship with MicroEdge in relation to their jointly-developed software plan. Plaintiff further asserts that at various points throughout Mission Measurement's and MicroEdge's contract negotiations, the Defendants – except for Blackbaud – intended to induce Mission Measurement to engage in various contractual agreements with MicroEdge, which ultimately eliminated it from the market. The remaining Individual Defendants, as corporate officers who had influence over MicroEdge, repeatedly assured Mission Measurement that they were moving forward together. Plaintiff contends that Vista Management and Sagemount gave MicroEdge guidance in this matter. As to Blackbaud, it was aware of MicroEdge's contractual relationship with Mission Measurement, yet acquired MicroEdge despite this knowledge without giving attribution or remuneration to Mission Measurement. Again, Mission Measurement maintains that it relied on these representations and refrained from engaging in any development efforts with other partners, and as a result, Defendants' conduct kept it out of the market.

Examining these facts as true and construing all reasonable inferences in Plaintiff's favor, Plaintiff has adequately alleged that Defendants intentionally interfered with MicroEdge's and Mission Measurement's prospective business relationship preventing Mission Measurement from realizing the revenues of the jointly-developed software. *See, e.g., UIRC-GSA Holdings Inc. v. William Blair & Co., L.L.C.,* ___ F.Supp.3d ___, 2017 WL 3706625, at *8 (N.D. Ill. Aug. 28,

2017); *MetroPCS v. Devor,* 215 F. Supp. 3d 626, 634 (N.D. Ill. 2016). Also, this conduct is qualitatively different from Plaintiff's allegations regarding the misappropriation of its trade secrets, and thus the ITSA does not preempt this claim. For the same reasons discussed above, Mission Measurement has sufficiently alleged facts overcoming the corporate officer privilege because it has plausibly alleged that Defendants' conduct was unjustified, especially in light of the alleged personal financial gain. *See Santangelo v. Crown Cork & Seal USA, Inc.*, 255 F. Supp. 3d 791, 811 (N.D. Ill. 2017) ("A corporate employee also can be held liable for interfering with his employer's business relationship with another employee if the employee 'places his or her own interests ahead of the corporate entity's interests.'") (citation omitted). As such, the Court denies Defendants' Rule 12(b)(6) motions to dismiss Count IX.

## C.    Fraudulent Inducement – Count X

Mission Measurement brings a fraudulent inducement claim against MicroEdge, Vista Management, and the remaining Individual Defendants in Count X. Under Illinois law, a fraudulent inducement claim requires proof of: (1) a false statement of material fact; (2) defendant's knowledge the statement was false; (3) defendant's intent to induce the plaintiff to act, (4) plaintiff's reliance on the truth of the statement; and (5) damages resulting from such reliance. *See Massuda v. Panda Exp., Inc.,* 759 F.3d 779, 783 (7th Cir. 2014); *Hoseman v. Weinschneider,* 322 F.3d 468, 476 (7th Cir. 2003). "A party with a fraudulent inducement claim may either affirm the contract and sue for damages or rescind the contract." *Wobble Light, Inc. v. McLain/Smigiel P'ship,* 890 F. Supp. 721, 723 (N.D. Ill. 1995); *see also On Command Video Corp. v. Roti,* No. 09 C 3130, 2010 WL 2740309, at *2 (N.D. Ill. July 12, 2010). Pursuant to the heightened federal pleading standards of Rule 9(b), a plaintiff alleging fraud must state with particularity the circumstances constituting fraud. *See Wigod v. Wells Fargo Bank, N.A.,* 673

F.3d 547, 569 (7th Cir. 2012). The Seventh Circuit has "summarized the particularity requirement as calling for the first paragraph of any newspaper story: 'the who, what, when, where, and how.'" *Id.* (citation omitted). Put differently, a plaintiff must allege "the identity of the person making the misrepresentation, the time, place, and content of the misrepresentation, and the method by which the misrepresentation was communicated to the plaintiff." *United States ex. rel. Hanna,* 834 F.3d at 779. Additionally, "group pleading" does not satisfy Rule 9(b)'s heightened pleading requirement. *See Rocha,* 826 F.3d at 911; *United States ex rel. Zverev v. USA Vein Clinics of Chicago, LLC,* 244 F. Supp. 3d 737, 748 (N.D. Ill. 2017).

Here, Defendants argue that Plaintiff has failed to plead its fraudulent inducement claim with sufficient particularity as required by Rule 9(b). The Court agrees. Although Plaintiff alleges that the Individual Defendants intended to induce Mission Measurement to engage in contractual agreements with MicroEdge to keep Mission Measurement out of the market, it does so without specifically identifying which Individual Defendants had such "nefarious intentions." *See Rocha*, 826 F.3d at 911 ("because fair notice is the 'most basic consideration underlying Rule 9(b),' in a case involving multiple defendants, 'the complaint should inform each defendant of the nature of his alleged participation in the fraud.'") (citation omitted). Because Plaintiff's allegations concerning MicroEdge's corporate officers are insufficient under Rule 9(b), any such claim against MicroEdge similarly fails because Plaintiff does not identify any other individuals associated with MicroEdge in relation to its fraudulent inducement claim. *See Camasta,* 761 F.3d at 737 (Rule 9(b) requires plaintiff to state "the identity of the person making the misrepresentation") (citation omitted).

As to Vista Management, Plaintiff alleges that Alan Cline, a principal at Vista Management, contacted Mission Measurement for assistance in helping MicroEdge develop a

way to measure outcomes and that his initial contact led to a series of communications between Mission Measurement and MicroEdge with the goal to jointly develop and jointly own a new software. (*Id*. ¶¶ 34, 35.) Plaintiff's only other allegations concerning Cline are that he knew Mission Measurement's and MicroEdge's relation would increase MicroEdge's value in the long-term and that he made representations that Mission Measurement would share in the revenues from the joint project. (*Id*. ¶¶ 37, 72.) These allegations concerning Cline are too bare-boned to fulfill Rule 9(b)'s heightened pleading requirement, especially because the allegations concerning Cline's representations to Mission Measurement do not indicate the time, manner, and person he communicated with at Mission Measurement. *See Hanna,* 834 F.3d at 779 (Rule 9(b) requires "the method by which the misrepresentation was communicated to the plaintiff") (citation omitted). Otherwise, Plaintiff's allegations concerning Vista Management's fraudulent inducement fall short of fulfilling Rule 9(b) because Mission Measurement does not identify other agents or individuals associated with Vista Management who made misrepresentations. *See Camasta,* 761 F.3d at 737.

Setting aside Plaintiff's allegations based "on information and belief" and allegations in which it groups together certain Defendants, there are too few factual details left concerning the alleged fraudulent inducement to fulfill Rule 9(b)'s heightened pleading requirement. The Court therefore grants – without prejudice – Defendants' motions to dismiss Count X of the Second Amended Complaint. The Court grants Plaintiff leave to amend its fraudulent inducement claim in a Third Amended Complaint keeping in mind counsel's Rule 11 obligations.

### D.     Conversion – Count XI

Next, Mission Measurement brings a conversion claim against Blackbaud and MicroEdge in Count XI of the Second Amended Complaint. "To prove conversion under Illinois law, a

plaintiff must show that: (1) he has a right to the property at issue; (2) he has an absolute and unconditional right to the immediate possession of the property; (3) he made a demand for possession; and (4) the defendant wrongfully and without authorization assumed control, dominion, or ownership over the property." *Stevens v. Interactive Fin. Advisors, Inc.,* 830 F.3d 735, 738 (7th Cir. 2016). "[T]he Illinois Supreme Court has recognized that 'an action for conversion lies only for personal property which is tangible, or at least represented by or connected with something tangible.'" *Sheridan v. iHeartMedia, Inc.,* 255 F. Supp. 3d 767, 779 (N.D. Ill. 2017) (citation omitted); *see also American Nat'l Ins. Co. v. Citibank, N.A.*, 543 F.3d 907, 910 (7th Cir. 2008) ("Illinois courts do not recognize an action for conversion of intangible rights.").

In response to Blackbaud's and MicroEdge's motions to dismiss, Mission Measurement argues that the ITSA does not preempt its conversion claim because it has alleged that Blackbaud and MicroEdge have taken control over its tangible items and property – that do not include its trade secrets – such as software design specifications, impact reports and analytics, business plans, product development plans, and relevant drawings. Blackbaud and MicroEdge, however, argue that although these items are tangible, they derive their value from the protected trade secret information that they contain. *See Rubloff Dev. Grp., Inc. v. SuperValu, Inc.,* 863 F. Supp. 2d 732, 751 (N.D. Ill. 2012); *AutoMed Techs., Inc. v. Eller,* 160 F. Supp. 2d 915, 922 (N.D. Ill. 2001). At this stage of the lawsuit, the Court must accept Mission Measurement's well-pleaded allegations and all reasonable inferences as true, and thus, Defendants' characterization of these tangible items as containing trade secrets does not support the conclusion that Mission Measurement's conversion claim is implausible as a matter of law. *See Erickson v. Pardus,* 551 U.S. 89, 94, 127 S.Ct. 2197, 167 L.Ed.2d 1081 (2007) (per curiam) ("when ruling on a

defendant's motion to dismiss, a judge must accept as true all of the factual allegations contained in the complaint."). In short, Defendants' attempt to contradict Plaintiff's factual allegations is not appropriate at this stage of the proceedings. *See Smith v. Burge,* 222 F. Supp. 3d 669, 691 (N.D. Ill. 2016) ("defendant cannot, in presenting its 12(b)(6) challenge, attempt to refute the complaint or to present a different set of allegations" because "[t]he attack is on the sufficiency of the complaint, and the defendant cannot set or alter the terms of the dispute, but must demonstrate that the plaintiff's claim, as set forth by the complaint, is without legal consequence.") (citation omitted). The Court thereby denies MicroEdge's and Blackbaud's motion to dismiss Plaintiff's conversion claim alleged in Count XI.

### E. Unjust Enrichment – Count VII

In Count VII of the Second Amended Complaint, Mission Measurement alleges an unjust enrichment claim in the alternative. *See* Fed. R. Civ. P. 8(a)(2). To state a claim of unjust enrichment, "a plaintiff must allege that the defendant has unjustly retained a benefit to the plaintiff's detriment, and that defendant's retention of the benefit violates the fundamental principles of justice, equity, and good conscience." *Wilson v. Career Educ. Corp.,* 729 F.3d 665, 682 (7th Cir. 2013) (quoting *HPI Health Care Servs.,* 131 Ill.2d at 160). "Under Illinois law, unjust enrichment is not a separate cause of action," but '[r]ather, it is a condition that may be brought about by unlawful or improper conduct as defined by law, such as fraud, duress, or undue influence, and may be redressed by a cause of action based upon that improper conduct.'" *Pirelli,* 631 F.3d at 447 (citation omitted). As the *Pirelli* decision explains, "[f]or example, a breach of a contract, or of a fiduciary duty, might create a situation in which someone has retained a benefit that ought to be disgorged based on principles of equity." *Id.* Additionally, "unjust enrichment does not seek to compensate a plaintiff for loss or damages suffered but seeks

to disgorge a benefit that the defendant unjustly retains." *Blythe Holdings, Inc. v. DeAngelis,* 750 F.3d 653, 658 (7th Cir. 2014) (citation omitted).

Because certain contract and tortious interference claims survive Defendants' motions to dismiss, the Court turns to Plaintiff's alternative unjust enrichment claim based on the allegations underlying those claims. *See Reid v. Unilever U.S., Inc.,* 964 F. Supp. 2d 893, 922 (N.D. Ill. 2013) ("An unjust enrichment claim may be predicated on either quasi-contract or tort"); *see also In re Fluidmaster, Inc.,* 149 F.Supp.3d 940, 963 (N.D. Ill. 2016) ("While Plaintiffs' unjust enrichment claim may eventually give way to Plaintiffs' breach of contract and fraud claims, Plaintiffs may plead in the alternative at this stage in the litigation."). Here, Plaintiff maintains that it seeks recovery based on two sets of allegations: (1) Blackbaud's and MicroEdge's retaining the profits gained from the sales of Blackbaud Outcomes; and (2) Vista Management's, MicroEdge's, and the Individual Defendants' enrichment because Blackbaud purchased MicroEdge at an inflated price. Plaintiff explains that the first set of allegations is rooted in MicroEdge's and Mission Measurement's joint development of a software product that Blackbaud and MicroEdge launched without compensation or attribution to Mission Measurement. The second set is based on Defendants' conduct in inflating MicroEdge's sale price for their financial benefit, while in the process cutting Mission Measurement out of the picture before the acquisition took place, thereby, leaving it with no compensation for its efforts in developing the software product with MicroEdge.

Based on Plaintiff's allegations supporting its contract and tort claims, along with Plaintiff's well-pleaded assertions concerning Defendants' unjust enrichment, Plaintiff has adequately alleged a plausible unjust enrichment claim under *Iqbal* and *Twombly*. Defendants' arguments that the ITSA preempts Plaintiff's unjust enrichment claim are unavailing because the

conduct underlying this claim involves the various agreements and tortious conduct interfering with these agreements and not Defendants' misappropriation of Plaintiff's trade secrets. Further, Defendants' argument that their conduct did not deprive Plaintiff of any benefit also fails due to the allegations that Mission Measurement did not receive compensation or remuneration for its efforts in jointly developing the outcomes software. Therefore, the Court denies Defendants' motions to dismiss Plaintiff's alternative unjust enrichment claim.

### F.  Illinois Civil Conspiracy – Count XII

In Count XII, Plaintiff brings an Illinois civil conspiracy claim against MicroEdge, Blackaud, Vista Management, Charles Vanek, Kristin Nimsger, and Preston McKenzie. "Under Illinois tort law, a civil conspiracy requires '(1) an agreement between two or more persons for the purpose of accomplishing either an unlawful purpose or a lawful purpose by unlawful means; and (2) at least one tortious act by one of the co-conspirators in furtherance of the agreement that caused an injury to the plaintiff.'" *Turner v. Hirschbach Motor Lines,* 854 F.3d 926, 930 (7th Cir. 2017) (citation omitted); *see also Adcock v. Brakegate, Ltd.,* 164 Ill. 2d 54, 63, 206 Ill.Dec. 636, 645 N.E.2d 888 (Ill. 1994) ("A cause of action for civil conspiracy exists only if one of the parties to the agreement commits some act in furtherance of the agreement, which is itself a tort.").

In their motions to dismiss, Defendants first argue that Plaintiff's civil conspiracy claim "should be dismissed because it does not even plead any of the essential elements of the claim." (R. 89-1, Blackbaud Brief, at 9; *see also* R. 95, Vista Management Brief, at 23.)  It is well-settled, however, that the Federal Rules of Civil Procedure do not require plaintiffs to plead the elements of a legal theory because the rules "do not countenance dismissal of a complaint for [an] imperfect statement of the legal theory supporting the claim asserted." *Johnson v. City of*

*Shelby, Miss.,* 135 S. Ct. 346, 346 (2014); *see also Chapman,* 875 F.3d at 848. Simply put, "it is manifestly inappropriate for a district court to demand that complaints contain all legal elements (or factors) plus facts corresponding to each." *Chapman*, 875 F.3d at 848.

Defendants' better argument is that Plaintiff's civil conspiracy claim is duplicative of its tortious inference claims. *See Thermodyne Food Serv. Prod., Inc. v. McDonald's Corp.*, 940 F. Supp. 1300, 1310 (N.D. Ill. 1996) ("a conspiracy claim alleging a tort as the underlying wrongful act is duplicative where the underlying tort has been pled"). More specifically, "because a successful conspiracy claim enables a plaintiff to hold co-conspirators jointly liable for actions by other members of the conspiracy, a conspiracy claim is only actionable if it is based on new facts or seeks to extend liability for the underlying tort to new defendants." *Doctor's Data, Inc. v. Barrett,* 170 F. Supp. 3d 1087, 1159 (N.D. Ill. 2016) (internal citations omitted). Indeed, Plaintiff fails to allege new facts not already alleged in the underlying tort claims nor seeks to extend liability to additional defendants. *See Real Colors, Inc. v. Patel,* 974 F. Supp. 645, 651 (N.D. Ill. 1997) ("Conspiracy alleging a tort as the underlying wrongful act is actionable, as long as it includes additional defendants or new facts not already pled in the underlying tort"). As such, Plaintiff has not sufficiently alleged its civil conspiracy claim in Count XII. The Court grants – without prejudice – Defendants' motions to dismiss in this respect. The Court further grants Plaintiff leave to amend its civil conspiracy allegations in a Third Amended Complaint.

## CONCLUSION

For these reasons, the Court grants in part – with and without prejudice – and denies in part Defendants' motions to dismiss brought under Rules 12(b)(2) and 12(b)(6).

**Dated:**  December 13, 2017

ENTERED

AMY J. ST. EVE
United States District Judge