**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| **Mission Measurement Corporation,** ) | |
| Plaintiff, ) | |
| ) | Case No: 16 C 6003 |
| v. ) | |
| ) | Judge Ronald A. Guzmán |
| **Blackbaud, Inc., et al.,** ) | |
| Defendants. ) | |
| ) | |

## MEMORANDUM OPINION AND ORDER

For the reasons stated below, Defendants' motions for summary judgment [279, 291, 299] are granted. All other pending motions are stricken as moot. Within 7 days of the date of entry of this order, Plaintiff shall submit a statement as to whether any claims or defendants remain.

## STATEMENT

**Background**

The instant lawsuit stems, as so many do, from a business relationship gone bad. Mission Measurement ("MM") is a consulting firm working in the philanthropic sector and has described itself as a "global leader in measuring social impact" by using "data to help clients increase their impact and solve social problems more efficiently." (Pl.'s Ex. 12, Dkt. # 321-9, at 2.) In 2012, Jason Saul, Chief Executive Officer of MM, began talking to employees of MicroEdge about the two companies working together to create a new software product for the nonprofit sector that would assist philanthropic foundations and grant recipients in tracking the value of their investments in social endeavors. (Pl.'s Resp. Blackbaud's Stmt. Facts, Dkt. # 320, at 1, ¶ 1.) MM had a database of information it called the Outcomes Taxonomy that could be used to measure social impact. (*Id*. ¶ 2.) MM and MicroEdge entered into a Letter of Intent ("LOI") in January 2013 regarding the joint development of the aforementioned product, with the intention to negotiate toward a final agreement by May 1, 2013.

The LOI provided in part, as follows:

> 1. **Services**: MicroEdge and [MM] agree that the following services shall be performed by both parties. The parties acknowledge that the precise amount of resource input by each party for these services cannot be determined exactly. The intent of the services is to create the proposed outputs to determine the commercial viability of a product concept combining MicroEdge and [MM] assets.

> **(a) Joint product development**:
>
> MicroEdge and [MM] will collaborate to create a product consisting of software combining [MM]'s Outcomes Taxonomy and MicroEdge accounting and grants management software (the "Software"), consulting services to support use of the software and ongoing software and taxonomy maintenance. The output of this collaboration will be a product concept or set of product concepts that reasonably describe customer benefit, software functionality, approximate price point(s) and user experience such that reasonable market research can be conducted for purposes of commercial concept evaluation (collectively, the "product Concepts").
>
> **(b) Joint technology development**[:]
>
> To evaluate the feasibility of combining the Outcomes Taxonomy and MicroEdge software, [MM] will provide a copy and description of the OutcomesTaxonomy to MicroEdge; MicroEdge will be subject to the Restrictions outlined in section 11 regarding this software.
>
> **(c) Joint sales pitch meetings**:
>
> MicroEdge and [MM] will create work product to facilitate product concept pitches and sales pitches to the philanthropy sector. The output of this collaboration will be to meet with 8-12 very large foundations on the product concept(s) for the purposes of concept evaluation and potential early adopter recruiting.
>
> **(d) Market research**:
>
> As part of this product concept creation and evaluation, MicroEdge will engage a third-party researcher to contact clients and conduct product concept evaluation for purposes of commercial viability. This market research will be funded solely by MicroEdge.

(LOI, Dkt. # 16, ¶ 1.)

No additional agreement was signed after May 1, 2013. MicroEdge subsequently marketed itself for sale, and Blackbaud bought MicroEdge in October 2014 for $140 million. In 2016, Blackbaud launched "Blackbaud Outcomes," which the parties agree does not incorporate MM's Outcomes Taxonomy. Additional facts are discussed as necessary in the text of the order.

MM filed the instant lawsuit in June 2016 against Blackbaud, MicroEdge, and Vista

Equity Partners,[1] alleging various claims, including breach of contract, tortious interference, federal and state-law trade secret violations, and unjust enrichment. The Defendants have filed separate summary judgment motions, which are addressed in turn below.

**Summary Judgment Standard**

Summary judgment is proper where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine factual dispute exists when there is enough evidence that a reasonable jury could find in favor of the nonmoving party. *Whiting v. Wexford Health Sources, Inc.*, 839 F.3d 658, 661 (7th Cir. 2016). In construing the evidence and facts supported by the record in favor of the non-moving party, the Court gives the non-moving party "the benefit of reasonable inferences from the evidence, but not speculative inferences in [its] favor." *White v. City of Chi.*, 829 F.3d 837, 841 (7th Cir. 2016) (internal citations omitted).

**Analysis**

  A. <u>Vista Equity Partners Management ("Vista")</u>

Vista Management provided management services to MicroEdge pursuant to a management agreement dated October 1, 2009, as amended on December 27, 2012. Their relationship terminated upon the close of the MicroEdge sale to Blackbaud on October 1, 2014. Vista Management is affiliated with certain private equity funds, including VFF I AIV I, L.P. and VFF I AIV I-A, L.P. (the "Vista Funds"), which held a majority of MicroEdge's stock prior to the sale of MicroEdge to Blackbaud.[2] MM alleges claims of tortious interference with contract and prospective economic advantage and unjust enrichment against Vista.

As noted above, MM and MicroEdge discussed "integrating [MM]'s Outcomes Taxonomy into MicroEdge's . . . existing products." (Pl.'s Resp. Vista's Stmt. Facts, Dkt. # 320, at 54, ¶ 7.) MicroEdge and MM made a joint presentation containing a sample of MM's Outcomes Taxonomy at a MicroEdge user conference in October 2012. (*Id*. ¶ 8.) MM and MicroEdge entered into the LOI in January 2013. (*Id*. ¶ 9.) The LOI provided that "[i]t is the intention of the parties that they will negotiate in good faith and execute the final Agreement by May 1, 2013. In the event that the parties are unable to conclude a final Agreement by that date, this LOI and the intentions set forth herein expire." (*Id*. ¶ 10.) The parties did not enter into any other written agreement after the LOI. (*Id*. ¶ 11.)

In Illinois, tortious interference with a prospective business relationship has four

---

[1] Previously-dismissed claims and defendants will not be discussed in this ruling.

[2] Although originally named as defendants, the funds were dismissed as defendants in the Court's motion-to-dismiss ruling. (3/26/18 Mem. Op. & Order, Dkt. # 142, at 13.)

elements: "'(1) [the plaintiff's] reasonable expectation of entering into a valid business relationship; (2) the defendant's knowledge of the plaintiff's expectancy; (3) purposeful interference by the defendant that prevents the plaintiff's legitimate expectancy from ripening into a valid business relationship; and (4) damages to the plaintiff resulting from such interference.'" *ATC Healthcare Servs., Inc. v. RCM Techs., Inc.*, No. 15 C 8020, 2019 WL 3554009, at *3 (N.D. Ill. Aug. 5, 2019) (citation omitted). Tortious interference with a contractual relationship is similar and requires a plaintiff to establish: "(1) the existence of a valid and enforceable contract between it and another; (2) [the defendant's] awareness of the contract; (3) [the defendant's] intentional and unjustified inducement of a breach of that contract; (4) a subsequent breach of the contract by the other, caused by [the defendant]; and (5) damages." *Grecian Delight Foods, Inc. v. Great Am. Ins. Co. of N.Y.*, 365 F. Supp. 3d 948, 954 (N.D. Ill. 2019).[3]

Both tortious interference claims fail because MM points to no evidence supporting its claim for damages against Vista. Indeed, MM acknowledges that its damages expert, V. Walter Bratic, failed to compute damages for either tortious interference claim. (Pl.'s Resp. Vista's Stmt. Facts, Dkt. # 320, at 76, ¶ 41 (responding "Undisputed" to Vista's statement of fact that "Mr. Bratic did not calculate damages for either of Plaintiff's tortious interference claims.").) MM's entire response regarding its failure to establish tortious interference damages is as follows: "Defendants' argument that [MM] cannot support the element of damages would . . . require the Court to construe disputed issues of fact against [MM]." (Pl.'s Omnibus Resp., Dkt. # 322, at 39.) MM cites to its response to Blackbaud's statement of fact paragraph 69 in which it argues that it has been damaged, but *admits* that it is "[u]ndisputed that [it] has not disclosed a calculation of these damages." (Pl.'s Resp. Blackbaud's Stmt. Facts, Dkt. # 320, at 1, ¶ 69.) MM's assertion that it has damages but they simply have not been quantified is unavailing. "A nonmovant's failure to produce sufficient evidence of the damages element of its claim calls for the entry of summary judgment against that party." *Dunkin' Donuts Inc. v. N.A.S.T., Inc.*, 428 F. Supp. 2d 761, 767 (N.D. Ill. 2005).

MM's tortious interference claims also fail because any alleged damages would be excluded under Federal Rule of Civil Procedure 37 given that MM failed to disclose any damages calculations and does not justify its failure to disclose or attempt to demonstrate that such failure is harmless. *Indep. Tr. Corp. v. Fid. Nat. Title Ins. Co. of N.Y.*, 577 F. Supp. 2d 1023, 1048 (N.D. Ill. 2008) ("Failing to include a damage claim among initial or supplemented disclosures, or to disclose it in response to an interrogatory, mandates exclusion as a sanction, unless the party failing to make disclosures can show that its violation was justified or harmless."). For these reasons, Vista is entitled to judgment on MM's tortious interference claims.

MM also alleges unjust enrichment against Vista. "To recover under a theory of unjust enrichment, a plaintiff 'must show that defendant voluntarily accepted a benefit which would be inequitable for [it] to retain without payment [to the plaintiff].'" *Mandelstein v. Rukin*, No. 17 C

---

[3] Because the parties cite to Illinois law, the Court does as well.

4

9216, 2019 WL 3857886, at *10 (N.D. Ill. Aug. 16, 2019) (citation omitted). According to MM, Vista was "unjustly enriched through the sale of MicroEdge to Blackbaud for an inflated price, in which the price was inflated due to and as a result of MicroEdge's relationship with Mission Measurement and information learned through such relationship." (3d Am. Comp., Dkt. # 119, ¶ 120 .) But "wrongful conduct alone will not support an unjust enrichment claim . . . ; the *plaintiff must also have some interest in the property* that a third party gave to the defendant." *Indep. Tr. Corp.*, 577 F. Supp. 2d at 1050 (emphasis added). MM points to no evidence that it had an interest in or some entitlement to the purported inflated payment Blackbaud made to MicroEdge, which MM contends was owned, at least in part, by Vista.[4] Accordingly, the motion for summary judgment as to the unjust enrichment claim against Vista is granted.

  B.  MicroEdge

MM alleges that MicroEdge breached the confidentiality and non-compete provisions of the LOI, which contains a New York choice-of-law provision. Under New York law, "the initial interpretation of a contract is a matter of law for the court to decide," and where the contract is unambiguous, a court is "required to give effect to the contract as written." *360Heros, Inc. v. Mainstreet Am. Assurance Co.*, No. 517CV549MADDEP, 2019 WL 3713665, at *4 (N.D.N.Y. Aug. 7, 2019) (citation and internal quotation marks omitted). Further,

> The fundamental, neutral precept of contract interpretation is that agreements are construed in accord with the parties' intent . . . . The best evidence of what parties to a written agreement intend is what they say in their writing . . . . Thus, a written agreement that is complete, clear and unambiguous on its face must be enforced according to the plain meaning of its terms . . . . A contract is unambiguous if the language it uses has a definite and precise meaning, unattended by danger of misconception in the purport of the [agreement] itself, and concerning which there is no reasonable basis for a difference of opinion . . . . Thus, if the agreement on its face is reasonably susceptible of only one meaning, a court is not free to alter the contract.

*Buchovecky v. S & J Morrell, Inc.*, No. 18-02352, 2019 WL 3954656, at *1 (N.Y. App. Div. Aug. 22, 2019). "An ambiguity exists where the terms of the contract 'could suggest more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business.'" *Law Debenture Tr. Co. of N.Y. v. Maverick Tube Corp.*, 595 F.3d 458, 466 (2d Cir. 2010) (citation omitted).

---

[4] MM contends that Vista received a benefit because it held an interest in MicroEdge and "its distribution [from the sale] was sent to the Vista Funds for Vista's benefit." (Pl.'s Resp., Dkt. # 322, at 40.) The Court need not address this issue as MM has failed to establish a genuine issue of fact as to whether it had any interest in the purported inflated sale price.

5

MicroEdge denies liability for breach of the LOI on the ground that the plain language of the LOI indicates that it had expired by the time MicroEdge was sold to Blackbaud in October 2014, relying on the following language in paragraph 12 of the LOI:

> It is the intention of the parties that they will negotiate in good faith and execute the final Agreement by May 1, 2013. In the event that the parties are unable to conclude a final Agreement by that date, this LOI and the intentions set forth herein expire.

(LOI, Dkt. # 16, ¶ 12.)

As noted by MM, however, this language is preceded by language in paragraph 4, entitled "Term; Termination," which states that

> [b]oth parties mutually agree that a Master Agreement will be executed by the parties no later than May 1, 2013. Should [the] parties fail to enter into a Master Agreement on or before May 1, 2013, either party may elect to terminate this LOI and other agreements. In the event the parties fail to enter into a Master Agreement and terminate this LOI, both parties agree not to directly or indirectly provide, market or sell any product, device, services or instrument that is substantially similar to the Software and/or Product Concepts for a period of eighteen (18) [months] following the termination of the Agreement. Following termination of the LOI or any other agreement (for whatever reason), both parties shall certify that it has [sic] returned or destroyed all copies of the applicable software, content, taxonomies and Confidential Information and acknowledges that its rights to use the same are relinquished.

(*Id*. ¶ 4.)

According to MM, paragraph 4 is more specific than paragraph 12 and thus controls. Because no Master Agreement was entered into by May 1, 2013, but neither party gave notice of termination, MM contends that "MicroEdge's contractual obligations endured." (Pl.'s Omnibus Resp., Dkt. # 322, at 12.) According to MM, paragraph 4 provides that the parties could "*elect* to terminate" the LOI on or after May 1, 2013; thus, the LOI could not have automatically expired on May 1, 2013 as stated in paragraph 12, "and instead[,] further action was required to effect termination." (*Id*.) MM's additional position is that paragraph 12 contains only recitals, which do not constitute the contract's "operative promises." (*Id*. at 13 (citing *United States v. Hamdi*, 432 F.3d 115, 122 (2d Cir. 2005) ("[C]ontracts may, and frequently do, include recitals of the purposes and motives of the contracting parties, which may shed light on, but are distinct from, the contract`'s operative promises to perform.").)

MicroEdge, on the other hand, argues that Paragraph 12 can be reconciled with paragraph 4 in that "either party could elect to 'terminate' the LOI if they failed to enter into a Master Agreement by May 1, 2013[,]" but "if neither party terminated before May 1, 2013, the

6

agreement would expire" pursuant to paragraph 12. (MicroEdge's Br. Supp. Mot. Summ. J., Dkt. # 378, at 4.)

While MicroEdge's interpretation has some appeal, the LOI has too many inconsistencies and examples of poor draftsmanship to definitively conclude that the parties intended the construction that MicroEdge offers. Upon review of the entire LOI, many questions linger regarding the parties' intent. For example, why would the parties agree that if one or both of them actively "terminated" the LOI pursuant to paragraph 4, then they could not provide, market, or sell the Software and/or Product Concepts for 18 months, but the same restriction did not apply if the LOI expired on May 1, 2013 pursuant to paragraph 12?

In addition, paragraph 4 ends with the sentence stating that

> [e]ach party will at all times, both during the Term *and thereafter*, keep and hold all Confidential Information of the other Party in the strictest confidence, and will not use such Confidential Information for any purpose, other than as may reasonably be necessary for the performance of its duties pursuant to this Agreement, without the other Party's written consent.

(LOI, Dkt. # 16, ¶ 4.) How long is "thereafter" (is it an imprecise reference to the 18 months noted in paragraph 4?), and did the parties intend this provision to mean that they had ongoing obligations of confidentiality even after termination or expiration?

Further, as noted by MicroEdge, the LOI, which was executed on January 16, 2013, stated it had a three-month term, to April 16, 2013, which could have been extended 30 days, to May 16, 2013. But the purported self-executing expiration date was May 1, 2013. This makes no sense. Further, while paragraph 12 ends with the statement that the "Confidentiality Agreement is hereby ratified and confirmed as a separate agreement between the parties thereto[,]" the second sentence of the next paragraph states that "[t]his letter constitutes the entire understanding and agreement between the parties hereto and their affiliates with respect to its subject matter and supersedes all prior or contemporaneous agreements, representation, warranties and understandings of such parties (whether oral or written)."[5] (LOI, Dkt. # 16, ¶¶ 12, 13.) Why would the parties ratify and confirm an agreement that they, two sentences later, agree is superseded by the LOI? Finally, paragraph 14 states that "[t]he following provisions will survive any termination or expiration of these LOI sections 2, 4, 5, 6, 7, 8, 9, 10 and 12." (*Id*. ¶ 14.) It is entirely unclear what this paragraph means. Did the parties intend to provide that the confidentiality provision in paragraph 4 would survive termination or expiration? Further,

---

[5] The Confidentiality Agreement was executed on June 26, 2012. (Pl.'s Ex. 1, Dkt. # 321-2.) The judge who was previously assigned to this case concluded that the Confidentiality Agreement was superseded by the merger clause in paragraph 13 of the LOI and thus dismissed MM's breach of contract claim based on the Confidentiality Agreement, which was much more detailed than the confidentiality provisions contained in the LOI.

7

why specify a term for the rights and obligations set forth in the LOI if the parties intended the majority of the provisions to survive termination or expiration?

After lengthy examination and attempts to reconcile the various provisions at issue in the LOI, the Court concludes that the language of the LOI is ambiguous and the parties' intent with respect to confidentiality and the term of the LOI cannot be determined from its express language. The Court is therefore unpersuaded by MicroEdge's argument that the breach of the LOI claim must fail because it was not in effect at the time of MicroEdge's sale to Blackbaud.

Assuming arguendo that the LOI had not expired or terminated and the confidentiality provisions remained intact, MicroEdge contends that there is no evidence that it disclosed MM's confidential information to Blackbaud. The Court disagrees. It is undisputed that in July 2012, an employee of MM sent MicroEdge "'a sample from [MM]'s database,' consisting of a native Excel sample from Mission Measurement's Metrics Database consisting of at least 214 rows and 13 columns." (Defs.' Combined Resp. Pl.'s Stmt. Facts, Dkt. # 374, ¶ 20.) It is further undisputed that "[b]etween July 17, 2012 and August 2, 2012, [a MM employee] exchanged emails with [a MicroEdge employee] regarding 'how a client would use [MM's] taxonomy." (*Id*. ¶ 21.) Moreover, on June 28, 2013, in response to a request by Charles Vanek of MicroEdge, who was "[i]n near desperate need" of a "a partial cut of the MM taxonomy for a well known program area," a MM employee sent Vanek "a cut of the Outcomes Taxonomy from the Education area with a few different Education Sub Categories from our Outcomes Taxonomy Web Application." (*Id*. ¶ 29; Pl.'s Ex. 3, Dkt. # 321-4.) Further, Vanek forwarded excerpts of the MM Outcomes Taxonomy that he had received to MicroEdge employees, stating it was "[f]or discussion" and "[shows] [h]ow one taxonomy provider [i.e., MM] organizes their info[,]" and that he "see[s] us converging to some structure where several categories and sub-categories point at oft-used measurements. . . ." (Defs.' Combined Resp. Pl.'s Stmt. Facts, Dkt. # 374, ¶ 90.) Given MM's position that MicroEdge improperly benefitted in some way from MM's knowledge and background in the relevant industry, these facts, viewed in a light most favorable to MM, could allow a reasonable juror to conclude that MicroEdge somehow used confidential information in a manner that was violative of the terms of the LOI.

The LOI also contains a non-compete provision that states that "in the event the parties fail to enter into a Master Agreement and terminate this LOI, both parties agree not to directly or indirectly provide, market or sell any product, device, services or instrument that is substantially similar to the Software and/or Product Concept(s) for a period of 18 [months] following the termination of the Agreement." (LOI, Dkt. # 16, ¶¶ 39-40.) MM contends that MicroEdge breached this provision in October 2015 when it marketed Blackbaud Outcomes to the public. MicroEdge responds that no breach of the non-compete could have occurred at that time because the LOI had already expired. Resolution of this issue would rest, as with the confidentiality provision, on how the term of the LOI would be interpreted by a jury; presentation to a jury, however, is ultimately unnecessary because, as the Court explains next, MM's breach of contract claim fails on the damages element.

MicroEdge argues that MM's calculation of damages lacks any causal nexus to its claim

8

for breach of the LOI. To the extent that MicroEdge relies on the lack of evidence that MicroEdge disclosed any Confidential Information to Blackbaud, this contention fails to provide a basis on which to grant summary judgment because the Court concluded above that this was an issue for the jury. MicroEdge also asserts that "because no calculation of damages is attributable to MicroEdge's alleged breach of the non-compete provision or other provisions in the [LOI], no reasonable finder of fact could return a verdict or reasonably apportion damages for MM in its claim for breach of the [LOI]." (Br. Supp. MicroEdge's Mot. Summ. J., Dkt. # 378, at 10.)

In response, MM asserts that "MicroEdge . . . developed contemporaneous financial analyses of . . . how much the outcomes product it was marketing [by using MM's Outcomes Taxonomy and benchmarking methodology] to potential purchasers (along with its feigned expertise to bring such a product to market) increased [MicroEdge's] value [to potential purchasers]." (Pl.'s Omnibus Resp., Dkt. # 322, at 24.) According to MM, MicroEdge profited by $34.1 million as a result of its breach, which represents the "increase in its enterprise value" from having improperly used MM's confidential information to market and sell itself to Blackbaud. (*Id*. at 25.) MM "seeks damages as measured by the product (and feigned expertise) MicroEdge improperly marketed and sold to Blackbaud during the acquisition process in violation of the LOI – not damages measured by the value of Blackbaud Outcomes when it was released, which was a different product [from MM's Outcomes Taxonomy.]" (*Id*. at 26.) In other words, MM contends that it was somehow injured when MicroEdge used information it gained from MM to pretend it had expertise in the measurement of grants and charitable investments and created a product it marketed to Blackbaud.

But MM's characterization of the breach of contract damages to which it is entitled as well as its calculation of the purported damages are insufficient to survive summary judgment. First, MM's damages argument refers on several occasions to MicroEdge's purportedly being unjustly enriched by virtue of breaching the LOI (i.e., the confidentiality and non-compete provisions). To the extent that a contract exists, a party cannot recover for unjust enrichment. As a New York court has stated:

> "[W]here there is an express contract that clearly controls, the unjust enrichment claim should be dismissed." Here, the Engagement Agreement and Settlement Agreement clearly control. *In fact, plaintiffs rely on these contracts in their attempt to plead unjust enrichment. See* Am. Compl. ¶ 98 ("Defendants Habib and FCM have been unjustly enriched by the FCM Consulting Agreement and Settlement Agreement in which they received a benefit of tens of millions of dollars at the expense of Ortho in return for providing almost no work, beyond providing access to subcontractors."). A party dissatisfied with the results of a contract cannot use an unjust enrichment claim to reform it: "An unjust enrichment claim is not available where it simply duplicates, or replaces, a conventional contract or tort claim. . . .To the extent that these claims succeed, the unjust enrichment claim is duplicative; if plaintiffs' other claims are defective, an unjust enrichment claim cannot remedy the defects."

9

*Ortho-Clinical Diagnostics Bermuda Co. v. FCM, LLC*, No. 15 CIV. 5607 (NRB), 2017 WL 2984023, at *6 (S.D.N.Y. July 6, 2017) (certain internal citations omitted) (emphasis added). *See also Miszczyszyn v. JPMorgan Chase Bank, N.A.*, No. 18 C 3633, 2019 WL 1254912, at *4 (N.D. Ill. Mar. 19, 2019) ("'A plaintiff may plead as follows: (1) there is an express contract, and the defendant is liable for breach of it; and (2) if there is not an express contract, then the defendant is liable for unjustly enriching himself at my expense.' However, a plaintiff may not acknowledge throughout [its] complaint that there is an express contract, but then allege that if the defendant did not breach the contract, then it owes damages for unjustly enriching itself.") (internal citation omitted). Here, MM acknowledges and asserts that the parties' relationship is governed by an express contract. Therefore, to the extent that MM relies upon unjust enrichment as a measure of damages it incurred as a result of the alleged breach of contract, the position is misplaced.

MM then slightly repackages the argument by asserting that the proper measure of damages is the disgorgement of MicroEdge's "profits," citing *Pencom Sys., Inc. v. Shapiro*, 598 N.Y.S.2d 212, 212 (N.Y. App. Ct. 1993). As noted by the *Pencom* court, in the unfair competition context,

> [t]he proper measure of damages is the net profit of which plaintiff was deprived by reason of defendant's improper competition with plaintiff. Disgorgement of defendant's profits would be the proper measure of damage *if defendant had used the trade secrets for his own benefit while still in plaintiff's employ*.

*Id.* (emphasis added). MM's attempt to analogize the instant case to an employee who used confidential information while in Plaintiff's employ is unconvincing. As an initial matter, profits represent what is left after expenses are subtracted from revenue. Yet, as MM asserts, the $34.1 million it seeks supposedly represents the "increase in MicroEdge's enterprise value," not profits at MM's expense. More importantly, the Second Circuit recently referred to the lack of "any New York case allowing a plaintiff to recover a defendant's ill-gotten profits as an alternative to traditional remedies for breach of a contract." *Scienton Techs., Inc. v. Computer Assocs. Int'l, Inc.*, 703 F. App'x 6, 10 (2d Cir. 2017) ("Scienton argues not that CA's ill-gotten profits amount to their losses for any breach of the MNDA, but instead that ill-gotten profits are an appropriate alternative remedy. This argument is unavailing. Scienton fails to cite any New York case allowing a plaintiff to recover a defendant's ill-gotten profits as an alternative to traditional remedies for breach of a contract."). *See also Franconero v. Universal Music Corp.*, No. 02 CIV.1963(BSJ), 2011 WL 566794, at *4 (S.D.N.Y. Feb. 11, 2011) ("Plaintiff's damages expert . . . argues the proper measurement of damages should be all of the revenue Defendant received from coupled uses. This constitutes disgorgement. It is well-settled that '[d]isgorgement ... is not an appropriate remedy for a breach of contract' because '[d]isgorgement looks to the defendant's ill-gotten gains, rather than to the plaintiff's losses.'") (citations and footnotes omitted). MM points to no loss it suffered based on MicroEdge's sale to Blackbaud.[6]

---

[6] Moreover, MM fails to demonstrate how MicroEdge's use of confidential information and its violation of the non-compete, assuming they occurred, support a finding of $34.1 million

Accordingly, MicroEdge's summary judgment motion on the breach of contract claim is granted.

MM's unjust enrichment claim against MicroEdge fails for the reasons discussed above. Moreover, to the extent that the unjust enrichment claim is based on misappropriation of trade secrets, it is preempted by Illinois Trade Secrets Act ("ITSA"). *See Am. Ctr. for Excellence in Surgical Assisting Inc. v. Cmty. Coll. Dist. 502*, 190 F. Supp. 3d 812, 824 (N.D. Ill. 2016) ("Because 'unjust enrichment . . . claims, when based on misappropriation of a trade secret, have been replaced under Illinois law by' ITSA, ITSA preempts the unjust enrichment claim."). For these reasons, summary judgment is granted to MicroEdge on this claim.[7]

Finally, MM also brings an ITSA claim against MicroEdge.[8] "To sustain a claim for misappropriation of a trade secret, [a plaintiff] must show (1) there was a trade secret, (2) the trade secret was misappropriated, and (3) the defendants used the trade secret in the course of business." *IPOX Schuster, LLC v. Nikko Asset Mgmt. Co.*, 304 F. Supp. 3d 746, 757 (N.D. Ill. 2018) (citing *Learning Curve Toys, Inc. v. PlayWood Toys, Inc.*, 342 F.3d 714, 721 (7th Cir. 2003)). As noted by another court, under ITSA:

> (d) "Trade secret" means information, including but not limited to, technical or non-technical data, a formula, pattern, compilation, program, device, method, technique, drawing, process, financial data, or list of actual or potential customers or suppliers, that:
> (1) is sufficiently secret to derive economic value, actual or potential, from not being generally known to other persons who can obtain economic value from its disclosure or use; and
> (2) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy or confidentiality.

---

in damages to MM. Because the parties do not engage in an in-depth analysis of Bratic's methodology in arriving at this number, the Court will not address the issue. Nevertheless, based on its initial review of Bratic's report, the Court notes that his methodology could present concerns under the standard articulated in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).

[7] Even assuming that unjust enrichment or disgorgement were the proper measure of damages for breach of the non-compete, MM asserts that the purported $34.1 million benefit to MicroEdge was "to [MM's] detriment, where [MM] waited in the wings, ignorant of MicroEdge's plans to compete with it, and turning down other offers to partner in reliance on its purported collaboration with MicroEdge." (Pl.'s Omnibus Resp., Dkt. # 322, at 28.) But this statement is unsupported by any record citation.

[8] MicroEdge incorporates Blackbaud's arguments in arguing that it is entitled to summary judgment on the ITSA claim. Thus, references to arguments by MicroEdge may be ones contained in Blackbaud's motion.

765 ILCS 1065/2(d). "Both of the Act's statutory requirements focus fundamentally on the secrecy of the information sought to be protected." "However, the requirements emphasize different aspects of secrecy. The first requirement, that the information be sufficiently secret to impart economic value because of its relative secrecy, 'precludes trade secret protection for information generally known or understood within an industry even if not to the public at large.'" "The second requirement, that the plaintiff take reasonable efforts to maintain the secrecy of the information, prevents a plaintiff who takes no affirmative measures to prevent others from using its proprietary information from obtaining trade secret protection."

Both requirements must be met for information to be a trade secret, so the failure to satisfy even one defeats an ITSA claim.

*Am. Ctr. for Excellence in Surgical Assisting Inc. v. Cmty. Coll. Dist. 502,* 315 F. Supp. 3d 1044, 1056-57 (N.D. Ill. 2018) (internal citations omitted).

MM contends the following three items constitute trade secrets under the ITSA: (1) the Outcomes Taxonomy; (2) excerpts of the Outcomes Taxonomy; (3) " a method for using a taxonomy to aggregate outcomes data and compare and benchmark heterogeneous grants." (Pl.'s Resp. Defs.' Stmt. Facts, Dkt. # 321 , ¶ 25.) ITSA "defines 'misappropriation' to mean 'acquisition of a trade secret by another person who knows or has reason to know that the trade secret was acquired by improper means,'" which "include 'theft, bribery, misrepresentation, [or] breach or inducement of breach of a confidential relationship.'" *Arjo, Inc. v. Handicare USA, Inc.*, No. 18 C 2554, 2018 WL 5298527, at *6 (N.D. Ill. Oct. 25, 2018) (citation omitted).

As an initial matter, it is undisputed that the full Outcomes Taxonomy was never sent or disclosed to MicroEdge, so the ITSA claim fails as to this alleged trade secret.[9] With respect to unspecified excerpts of the Outcomes Taxonomy, which presumably refer to those sent to MicroEdge, they were not labeled confidential or designated as confidential material in the email transmitting them to MicroEdge. (Pl.'s Resp. Defs.' Stmt. Facts, Dkt. # 321, ¶ 39.) Moreover, MM admits that certain parts of the Outcomes Taxonomy have been made public. (*Id.* ¶ 43.) Therefore, MM fails to establish a genuine issue of material fact that excerpts of the Outcomes Taxonomy constitute a trade secret under Illinois law. *See Am. Ctr. for Excellence in Surgical Assisting*, 315 F. Supp. 3d at 1058 ("[Plaintiff] did not take the kinds of affirmative measures courts have recognized as secrecy-preserving under Illinois law, such as 'limit[ing] access to the information to certain employees only, keep[ing] the information encrypted, password-protected, or locked, prevent[ing] copying of the protected information, or requir[ing] employees to sign confidentiality agreements.' To the contrary, [Plaintiff] itself sent the [purported trade secret] to

---

[9] The Court further notes as an aside that the Blackbaud Outcomes software does not incorporate the sample or other excerpts of MM's Outcomes Taxonomy, and it is undisputed that the sample of the Outcomes Taxonomy could not be used to reconstruct the Outcomes Taxonomy. (Pl.'s Resp. Defs.' Stmt. Facts, Dkt. # 321, ¶ 41.)

[Defendant] without first ensuring that she (or anyone else) would maintain its confidentiality.") (internal citations omitted).

This leaves MM's "method for using a taxonomy to aggregate outcomes data and compare and benchmark heterogeneous grants," which the parties refer to as the benchmarking methodology.[10] MM fails, however, to discuss in its response why the benchmarking methodology is a trade secret under ITSA. In response to MicroEdge's assertion that the concept of benchmarking is well-known and is therefore not a trade secret, MM simply asserts that it "is not claiming any protection in the general concept of measuring outcomes, but in the specific tools and method it developed." (Pl.'s Omnibus Resp., Dkt. # 322, at 30.) But its argument ends there. MM fails to cite to the record or expand on its assertion that its benchmarking methodology is a trade secret under Illinois law. Accordingly, MicroEdge's motion for summary judgment as to this and all aspects of the ITSA claim is granted.[11]

C. Blackbaud

With respect to MM's claims against Blackbaud based on unjust enrichment and the Defend Trade Secrets Act of 2016 ("DTSA"), MM states that it does not oppose Blackbaud's motion for summary judgment. Therefore, summary judgment is granted in favor of Blackbaud as to the unjust enrichment and DTSA claims.

MM also asserts an ITSA claim against Blackbaud, seeking unjust enrichment damages for the purported ITSA violation. But, as just stated, MM abandons its unjust enrichment claim against Blackbaud. Indeed, MM wholly fails to address how it could obtain any damages under ITSA against Blackbaud. Accordingly, Blackbaud's motion for summary judgment is granted as to the ITSA claim.

---

[10] In its statement of facts, MM describes benchmarking as "determin[ing] the average cost per outcomes among numerous grantees working to achieve the same outcome, and calculat[ing] a standard, or 'benchmark' cost per outcomes that can serve as the baseline for an effective grantee."

[11] The Court also notes that MM's evidence as to damages under ITSA is lacking. "'In terms of damages, the ITSA provides that '[i]f neither damages nor unjust enrichment caused by the misappropriation are proved by a preponderance of the evidence, the court may award damages . . . measured in terms of a reasonable royalty for a misappropriator's unauthorized disclosure or use of a trade secret.'" *Teledyne Techs., Inc. v. Shekar*, No. 15 C 1392, 2017 WL 5892251, at *12 (N.D. Ill. Apr. 27, 2017) (quoting 765 ILCS 1065/4(a)). As MicroEdge notes, MM has chosen not to pursue a reasonable royalty and has no evidence of actual losses. MM relies therefore on unjust enrichment caused by the misappropriation. However, as already discussed, MM's calculation of unjust enrichment damages faces significant hurdles, both in terms of causation and the methodology used to establish the purported unjust enrichment damages.

Finally, MM's claim of tortious interference against Blackbaud fails for the reasons previously discussed in the same claim against Vista.

**Conclusion**

For the reasons stated above, Vista's, MicroEdge's and Blackbaud's motions for summary judgment are granted.

**Date:** October 8, 2019

_____
**Ronald A. Guzmán**
**United States District Judge**